UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

———————————————————————— )
                                                    )
Solaia Technology LLC,                              )
                                                    )
                    Plaintiff,                      )    No. 02-C-4704
                                                    )
        v.                                          )    Judge Mark Filip
                                                    )
ArvinMeritor, Inc.,                                 )    Magistrate Judge Nan R. Nolan
                                                    )
                    Defendant,                      )
                                                    )
        v.                                          )
                                                    )
Rockwell Automation Inc.,                           )
                                                    )
                    Third-Party Defendant-          )
                    Cross-Claim Plaintiff,          )
                                                    )
        v.                                          )
                                                    )
Solaia Technology LLC,                              )
                                                    )
                    Cross-Claim Defendant-          )
                    Counterclaim-Plaintiff,         )
                                                    )
        v.                                          )
                                                    )
Rockwell Automation Inc.,                           )
                                                    )
                    Counterclaim-Defendant.         )
———————————————————————— )

## MEMORANDUM OPINION AND ORDER

Defendant ArvinMeritor, Inc. ("ArvinMeritor") moves for summary judgment on its non-

infringement claim against plaintiff Solaia Technology LLC ("Solaia").  (D.E. 569.)[1]

---

[1] The docket entries in this case are labeled "D.E. __."

ArvinMeritor also has moved to strike certain portions of the declaration of Solaia's purported expert witness, Walter Nuschke, offered by Solaia in response to ArvinMeritor's motion as to non-infringement. (D.E. 629.) For the reasons stated below, the Court grants ArvinMeritor's motion.

## BACKGROUND

I.      '318 Patent

Solaia is the assignee of United States Patent No. 5,038,318 ("the '318 patent"). (D.E. 575 ("Local Rule 56.1(a)(3) Statement of Facts by ArvinMeritor In Support of ArvinMeritor's Motion for Summary Judgment of Non-Infringement") ("ArvinMeritor's SF") ¶ 1.) The patent, titled "Device for Communicating Real Time Data Between a Programmable Logic Controller and a Program Operating In a Central Controller," discloses a system of programmable logic controllers[2] that "direct[s] automatic operation of such as machine tools, and process equipment to manufacture goods," and that "furnish[es] true real-time control of such programmable logic controllers (PLCs) through a general purpose spreadsheet program operating in a personal computer." ('318 patent, col. 1, lines 9-16.) The patentee acknowledged that prior to the invention, PLCs had been linked together in networks to coordinate the operation of a entire manufacturing system or processing plant. (Id., col. 1, line 67 – col. 2, line 1.) In these previous systems, however, any manufacturing changes desired by the operator of the manufacturing equipment had to be implemented by reprogramming the individual PLC. (Id., col. 2, lines 30-39.) "Developing customized programs that directly enabled an operator at a personal computer

---

[2] A programmable logic controller ("PLC") is a "specialized microprocessor-based controller typically used in a factory to monitor or control machines or equipment." (ArvinMeritor's SF ¶ 4.)

to supervise and actually control the automatic operation of the PLCs quickly becomes expensive due to the large amount of highly skilled labor." (*Id.*, col. 2, lines 40-44.) In the programs then available to provide this kind of "real time" exchange of information, a user would provide a circuit card interface between his process or instrument and the personal computer used to supervise it. (*Id.*, col. 2, lines 64-66.) The user would then write a "device driver program for the personal computer that facilitates the operating system program to communicate with the circuit card interface." (*Id.*, col. 2, line 66 – col. 3, line 1.) The user would then install a "commercially available information acquisition program to transfer desired information between the operating system program and popular and commercially available spreadsheet, data base and analysis programs," which would enable a user to control the manufacturing process from the spreadsheet, data base or analysis program. (*Id.*, col. 3, lines 1-8.)

The patent discloses a program "that operates through a general purpose spreadsheet program to effect information transfers to and from the addressable registers of a PLC and assigned cells of a displayed spreadsheet directly from the spreadsheet program without transfers through the operating system program or a specially written device driver program." ('318 patent, col. 3, lines 35-42.) The disclosed systems includes a network of PLCs that can receive and transmit messages to monitor and control the operation of the machine tool or processing station; a personal computer, including an interface card; a general purpose spreadsheet program; and an "add-in" program that adds communication functions to the spreadsheet program. (*Id.*, col. 3, lines 20-68.) This add-in program allows a spreadsheet program to move data directly to and from the interface card in the computer (*id.*, col. 5, lines 1-4), whereas such program normally only would be able to effect movement of information between files of data included in

3

the memory and the cells of the spreadsheet (*id.*, col. 4, lines 61-64).

Solaia sued ArvinMeritor and numerous other defendants, alleging that their

manufacturing systems infringe the '318 patent. Two claims are at issue in this case. Claim 11

recites, in pertinent part:

> 11. A system for operating equipment by an operator, the system comprising:
>
> > A. a plurality of programmable logic controllers coupled to the equipment, said programmable logic controllers each transmitting messages on a network *indicating the condition of said equipment*;
> >
> > B. a computer having operably interconnected visual display, keyboard, memory, and central processor . . .
> >
> > C. interface means electrically connected between said computer and said network for receiving messages from each of said programmable logic controllers . . .
> >
> > D. *spreadsheet instruction means* contained in said memory for *effecting a general purpose spreadsheet program* in said computer, said spreadsheet instruction means providing cells into which said operator can insert information and menu commands selectable by said operator, said spreadsheet means normally only being able to effect movement of information between files of data contained in said memory and said cells; and
> >
> > E. *add-in instruction means* contained in said memory for presenting add-in menu commands and interrupt selected instructions operating through said spreadsheet instruction means for said interrupt selected instructions to move sequentially received messages from said message registers to respective assigned address locations in said memory upon occurrence of each interrupt signal, and for said add-in menu commands to move said messages from said assigned address locations in said memory to respective assigned cells in said spreadsheet instruction means so that *messages from said programmable logic controllers indicating the condition of said equipment can be saved and moved directly to said cells.*

('318 patent, col. 16, line 44 -- col. 17, line 22 (emphases added).) Claim 12 recites, in pertinent

part:

4

12. A device for transmitting and receiving electrical signals forming messages to and from respective addressable registers located in respective addressable programmable logic controllers that are connected together over a communications network, said device comprising:

> A. process means connected to said communications network for moving said electrical signals forming messages to and from respective registers located in said processor means . . .

> B. *spreadsheet means* contained in said processor means, said spreadsheet means *presenting a spreadsheet of cells into which information can be inserted to facilitate executing actions through said spreadsheet means*, said spreadsheet means being capable of accessing said registers in said processor means through said actions;

> C. *add-in program means* contained in said processor means for *inserting in at least one cell information including the address of a particular register in a particular programmable logic controller* to which a message is to be sent and indicating the content of said message; and

> D. add-in program means contained in said processor means for executing an action in said spreadsheet means to cause said spreadsheet means to transmit said message from said cell. . . .

(*Id.*, col. 17, lines 23-56 (emphases added).)

II.     ArvinMeritor's Accused Systems[3]

---

[3] The Court takes the relevant facts from ArvinMeritor's Local Rule 56.1(a)(3) Statement of Facts by ArvinMeritor In Support of ArvinMeritor's Motion for Summary Judgment of Non-Infringement (D.E. 575 ("ArvinMeritor's SF")) and exhibits; from Solaia's L.R. 56.1(b)(3) Statement Including Response to ArvinMeritor's Statement of Facts and Additional Facts Requiring the Denial of Summary Judgment of Non-Infringement (D.E. 607 ("Solaia's Resp." or "Solaia's SAF")) and exhibits; and from ArvinMeritor's response thereto (D.E. 634 ("ArvinMeritor's Resp.")). Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311,

ArvinMeritor uses three systems in its manufacturing plants that Solaia alleges infringe the '318 patent. Two of these systems, the "Flex" and "PST" assembly lines ("Flex/PST"), use essentially identical automation equipment, and the parties have addressed them together for the purposes of this lawsuit. The third system is the "Rabofsky System," apparently denominated for the German vendor that supplied the system to ArvinMeritor.

## A. Flex/PST Systems

The Flex/PST systems are used in the production and testing of gas springs[4] in ArvinMeritor's plant in Marion, South Carolina. (ArvinMeritor's SF ¶ 16.) These systems use a computer program running on a personal computer to allow an operator to load a "recipe" for a particular part into PLCs connected via a network that, in turn, configure equipment used to assemble or test the springs. (*Id.* ¶¶ 18-20, 25, 26.) The personal computer runs a Visual Basic ("VB") program and a separate communication program called RSLinx (apparently licensed to ArvinMeritor by Rockwell). (*Id.* ¶ 18.) The personal computers used in the Flex/PST systems

1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party improperly denied a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). *See generally SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999) ("[W]hen considering appeals from a district court in patent cases we apply our own circuit law, except that with respect to purely procedural matters that are subject to local variation, we will customarily follow local law of the circuit in which the district court sits.").

[4] Gas springs are apparently a type of piston used, for example, on the hatch door of a minivan or SUV. (D.E. 573 (ArvinMeritor Mem. in Supp. of Mot.) at 9.)

have a virtual keyboard that allows a user to enter commands and instructions, as well as a visual display. (*Id.* ¶ 22.) The personal computers in each system use a Rockwell 1784-KTXD network interface card. (*Id.* ¶ 23.) The personal computers run the Windows 2000 operating system. (*Id.* ¶ 27; Solaia's Resp. ¶ 27.)

To use the Flex/PST system, an operator enters a part number in the VB program to identify the part to be manufactured on the line. (ArvinMeritor's SF ¶ 25.) The VB program will then retrieve and display the relevant specifications for that part from a database.[5] (*Id.*) The operator then touches a button on the screen to send the recipe for the part over the network to the PLCs. (*Id.* ¶ 26.) Data is transferred from the VB program to RSLinx, then to the interface card. (Solaia Resp. ¶ 29.) RSLinx contains device drivers in its code that enable the data to move to the interface card. (ArvinMeritor's SF ¶ 30; Solaia's Resp. ¶¶ 29, 30.) The Flex/PST systems do not contain the Lotus 1-2-3 spreadsheet program. (ArvinMeritor's SF ¶ 35.)

In the Flex/PST systems, the PLCs do not monitor any information concerning the equipment to which they are attached.[6] (ArvinMeritor's SF ¶ 32.) The VB programs in the Flex/PST systems check to determine if the recipe data was properly received by the PLC by

---

[5] The Court notes that Solaia has attempted to dispute this statement of fact by offering, *inter alia*, that the Flex/PST systems "permit the user to do other things." (Solaia's Resp. ¶ 25.) Whether this statement by Solaia is true, it does not create a dispute as to whether the systems function as stated by ArvinMeritor.

[6] Solaia attempts to deny this statement by providing deposition testimony from ArvinMeritor's expert, Kevin Welch, stating that the Flex system "has a plurality of programmable logic controllers coupled to the equipment, said programmable logic controllers each transmitting messages on a network indicating the condition of said equipment." (Solaia's Resp. ¶ 32 (citing Welch Dep. at 145-46).) This opinion as to the ultimate question of infringement is not a factual statement that denies whether the Flex/PST systems monitor the equipment to which the PLCs are attached.

reading a status bit (a "1" or a "0") in a specific register of the PLC.[7]  (*Id.* ¶ 33.)  The user sees a message that says, for example, "Recipe Loaded to PLC Successfully."  (*Id.*)

In the Flex/PST systems, a user does not input the address of a PLC register into the display program.  (ArvinMeritor's SF ¶ 38.)  PLC addresses are contained in a table in RSLinx and are given common names, called "tags."[8]  (Solaia Resp. ¶ 38.)  The values in the VB program are put into a string to be sent to RSLinx, which gives a particular PLC register address to the value.  (*Id.*)

B.    Rabofsky System

The Rabofsky system is used at an ArvinMeritor plant in Fayetteville, North Carolina, that makes cabin air filters for automobiles.  (ArvinMeritor's SF ¶ 39.)  The Rabofsky system uses three PLCs that are networked to a Siemens touch-screen computer containing a custom Simatic Pro Tool application and a communications program for communicating with the PLCs.  (*Id.* ¶ 41; Solaia's Resp. ¶ 41.)  The Siemens computer runs the Windows 2000 Professional operating system, and the network interface card used in the computer is a Profibus CP5611.  (ArvinMeritor's SF ¶¶ 43, 44.)  ArvinMeritor does not have the source code for the programs operating on the Siemens computer used in the Rabofsky system.  (*Id.* ¶ 47.)

When the Rabofsky system is powered on, a main menu is presented to the user to allow

---

[7]  Solaia's attempt to deny this statement fails for the same reason described in note 6, *infra*.

[8]  Solaia's five-page response to ArvinMeritor's paragraph 38 is largely argumentative and non-responsive to the issue whether a user inputs the address of a PLC register into the display program.  The numerous facts offered by Solaia in that response are properly before the Court only when offered as statements of fact rather than as part of a denial.  *See Kaplan v. City of Chicago*, 2004 WL 2496462, at * 2 (N.D. Ill. Nov. 4, 2004) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (striking additional facts submitted in responses).

the user to view data on various parts of the system by touching different areas of the screen. (ArvinMeritor's SF ¶ 48.) To manufacture a particular cabin air filter on the line, the operator selects the "Pleating Program" box on the main screen, which opens another screen where the operator can enter the name of a particular pleating program or select one from a pull-down menu. (*Id.* ¶ 49.) When a program is selected, the PLC values for that program appear in text boxes on the screen. (*Id.*) The operator then returns to the main menu, where he can start the machine by selecting the "Central Start" button. (*Id.*) In the Rabofsky system, a user does not enter the address of a PLC register into the display program. (ArvinMeritor's SF ¶ 51.)

## DISCUSSION

III.    Motion to Strike

ArvinMeritor has moved to strike certain portions of the declaration of Walter Nuschke, Solaia's purported expert, offered by Solaia to support its response to ArvinMeritor's motion for summary judgment ("Nuschke Declaration" or "the Declaration"). (*See* D.E. 629 ("Motion to Strike"); ArvinMeritor's Strike Ex. 1.) ArvinMeritor offers several reasons for its conclusion that striking portions of the Nuschke Declaration is proper: (1) the Declaration is untimely; (2) the Declaration is a "sham affidavit" because large segments are identical to language in Solaia's brief; (3) the Declaration contains newly disclosed opinions, certain of which contradict previously stated opinions; and (4) certain opinions in the Declaration are unreliable under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. The Declaration is 52 pages long and consists of various statements of background information and opinion, including lengthy quotations of testimony by other witnesses. For the

reasons stated below, the Court grants the Motion to Strike in part and denies it in part.

A.  Drafting By Counsel

ArvinMeritor challenges large portions of the Nuschke Declaration on the grounds that it was drafted by counsel and merely signed by Nuschke. (Motion to Strike at 7-9.) The Court exercises its discretion and declines to strike the affidavit on these grounds. It is not at all clear that the authority cited by ArvinMeritor helps it in this particular context. ArvinMeritor cites several cases for the general proposition that mere regurgitation of a lawyer's arguments in an expert's affidavit is improper. *See Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999); *EEOC v. BN Inc.*, 618 F. Supp. 1046, 1060 (N.D. Ill. 1985); *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 396 (N.D. Cal. 1991); *Occulto v. Adamar of NJ, Inc.*, 125 F.R.D. 611, 616 (D. N.J. 1989). The court in *Occulto* granted a motion to compel a party to produce a copy of the expert's report that had been produced by counsel which included the instructions, "PLEASE HAVE RE-TYPED ON YOUR OWN STATIONERY." *Occulto*, 125 F.R.D. at 617. The court expressed its concern over a report drafted by an attorney and signed by an expert, *id.* at 615-16, but it apparently considered such an error to go to the weight of the evidence rather than its admissibility, *id.* at 616 ("The weight accorded to an expert's opinion must vary in accordance with the expert's competence and knowledge; an expert who can be shown to have adopted the attorney's opinion as his own stands less tall before the jury than an expert who has engaged in painstaking inquiry and analysis before arriving at an opinion."). The court in *Intermedics*, too, addressed discovery of communications between counsel and an expert witness. *Intermedics*, 139 F.R.D. at 385. It did not address whether an expert's report or declaration should be stricken. The Court in *EEOC v. Burlington Northern*

10

made a single comment referencing an attorney's role in expert testimony: "[The opinions of two experts] remind this court that it has been patiently waiting for the day when it will hear an expert give an opinion that does not slavishly parrot the case theory of the lawyer who employs him." *Id.*, 618 F. Supp. at 1060. This certainly does not support the notion that an attorney's influence on expert testimony makes it *per se* inadmissible.

The case cited by ArvinMeritor that is perhaps the most relevant is *Manning*. In *Manning*, the court addressed a motion to bar an expert's testimony based on the fact that the expert report almost mirrored the allegations in the plaintiff's complaint. *Manning*, 1999 WL 342715, at *1. The court looked to the provision of Federal Rule of Civil Procedure 26 that requires an expert's report to be "prepared and signed by the witness." *Id.* at *2. While noting that the rule does not prohibit a party's attorney from providing assistance to the expert, *id.*, the court held that "ghost writing" by an attorney is impermissible, *id.* at *3. Importantly, however, the Court ultimately held that it could not "ascertain the level of [the expert's] involvement in the preparation of this report based solely on the comparison between the report and the complaint because it cannot determine who was responsible for each portion of the report," and the Court denied the motion. *Id.* at *4. Even if this Court were to find that *Manning* applied to affidavits prepared by experts in addition to the expert report, the Court finds that it, too, cannot ascertain the level of Nuschke's involvement from a mere comparison of his Declaration to Solaia's brief. "[T]he court cannot exclude the possibility that the [brief] was drawn from [Nuschke's] opinions rather than the other way around."[9] *Id.*

---

[9] While the similarity between the portion of the Nuschke Declaration and Solaia's brief in the *Jefferson Smurfit* case is troubling (*compare* D.E. 666 ("Solaia's Resp. to Motion to Strike") at 19 *with* Nuschke Decl. ¶ 40 *and* ArvinMeritor's Strike Ex. 8 (Solaia's Reply, March

11

While the Court declines to strike any portion of the Nuschke Declaration on this ground, the Court reminds the parties—Solaia, in particular—that an expert's role in litigation proceedings is to give his opinions in order to clarify areas of the facts that are not easily ascertained by the trier of fact. A report or a declaration submitted by an expert should be drafted with that goal in mind. Reiteration of parties' arguments and substantial block quoting of the patent or another witness's deposition testimony are improper additions to an expert's opinion; these are properly reserved for the attorneys' legal briefs.

B. Timeliness

Federal Rule of Civil Procedure 26 governs discovery related to expert witnesses. That rule requires a party to submit a written report prepared and signed by that party's purported expert witness. Fed. R. Civ. P. 26(a)(2)(B). The report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor." *Id.* The timing of expert disclosures, as other discovery, is set by the Court. Fed. R. Civ. P. 26(a)(2)(C). In this case, the Court ordered expert discovery by Solaia and ArvinMeritor to be completed by February 2004. (D.E. 533.) A party has an ongoing duty to supplement its disclosures, including testimony by an expert in both the expert's report and deposition, if "the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). Supplementation of expert testimony must be disclosed no later than 30 days before trial, unless otherwise directed by the court. *Id.*; Fed. Civ. P.

19, 2002) at 7-8), it is not sufficient for the Court to conclude that the entirety of the similarities can be ascribed to Solaia's attorneys.

26(a)(3). Rule 37 directs that a "party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).

ArvinMeritor argues that the Nuschke Declaration submitted with Solaia's response to summary judgment is untimely because it offers new opinions after the Court-ordered deadline for the close of expert discovery. Solaia argues, *inter alia*, that the Declaration should not be stricken as untimely because Rule 26 allows an expert to rebut an adversary's new expert,[10] and because Solaia apparently considers the Declaration a "supplemental report." Solaia's arguments are misguided. First, Rule 26 does allow a party's expert to submit a rebuttal report, but Solaia offers the Court no reason to believe that the Nuschke Declaration is such a report. The Court's deadline for the submission of rebuttal reports contemplated by the Rule—December 23, 2003—had long passed by the June 2004 date of the Nuschke Declaration.

Second, Solaia's argument that it has offered the Declaration as a supplement to Nuschke's original report is, with all respect, disingenuous. Solaia has never indicated that it was supplementing Nuschke's report for reasons consistent with Rule 26—*i.e.* that it had learned that the information in Nuschke's report was incorrect or incomplete. *See Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003) (striking late-filed report styled "supplemental opinion," noting that

---

[10] This argument is premised on Solaia's characterization of a witness offered by ArvinMeritor, Jeffrey Kehres, who offered a declaration in support of ArvinMeritor's Motion to Strike, as an expert rather than a fact witness. (*See* Solaia's Resp. to Motion to Strike at 2-3.) While Solaia declared in its response that there are problems with Kehres's declaration, Solaia has not moved to strike any portion of it, so the Court does not address the propriety of Kehres's declaration.

13

"Fed. R. Civ. P. 26(e) does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect"). It would appear that Nuschke's much expanded opinion was prompted solely by ArvinMeritor's summary judgment motion. Indeed, as ArvinMeritor points out, much of Nuschke's Declaration reads like a legal brief in that Nuschke often describes ArvinMeritor's summary judgment arguments then responds to them. This is not the proper role for supplementation of a report by an expert.

Thus, the Court must exclude the Declaration (specifically, the portions of the Declaration that constitute new opinions) from consideration unless Solaia has offered "substantial justification" for failing to offer the new opinions or the new opinions offered are harmless. *See* Fed. R. Civ. P. 37(c)(1); *accord Poulis-Minott v. Smith*, 388 F.3d 354, 357-59 (1st Cir. 2004) (affirming district court striking portions of late-disclosed expert affidavit that gave opinions not previously disclosed by expert in discovery); *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741, 743 (7th Cir. 1998) (affirming district court's sanction of precluding expert witnesses from testifying at trial where the party never offered a satisfactory explanation for its failure to meet court-ordered deadlines); *Baker v. Indian Prairie Community Unit, Sch. Dist. No. 204*, No. 96 C 3927, 1999 WL 988799, at *1-3 (N.D. Ill. Oct. 27, 1999) (striking new expert opinions offered after close of discovery stricken).

C.     New or Contradictory Opinions

Much of ArvinMeritor's motion is devoted to its contention that portions of Nuschke's report should be stricken because they contain new opinions or opinions that contradict prior opinions in Nuschke's report or deposition. If the late-filed opinions are new, they must be

14

stricken, as described above, unless Solaia offers a substantial justification for failing to disclose them earlier.[11] Likewise, a party may not defeat summary judgment by offering testimony that contradicts prior sworn testimony without explaining the contradiction or attempting to resolve the disparity. *See Cleveland v. Policy Mgt. Sys., Corp.*, 526 U.S. 795, 806 (1999). Thus, the Court's first step is to determine whether the statements by Nuschke are new or contradictory opinions. To do this, the Court compared the statements identified by ArvinMeritor with the statements offered by Solaia as evidence that Nuschke had already offered that particular opinion.[12] Where the Court determined that the statement was new or contradictory, it then looked to whether Solaia offered a substantial justification for Nuschke's late disclosure or resolved the contradiction. For the reasons described below, the Court strikes the following

---

[11] In response to each statement that ArvinMeritor has identified, Solaia has argued either that it is not a new opinion or that it is justified in offering the opinion at this late stage by new facts or opinions given by one of ArvinMeritor's witnesses. Solaia has not argued that its reliance on the Nuschke Declaration in its summary judgment papers is harmless to ArvinMeritor. Thus, the Court considers that argument waived. In any event, at this stage in the proceedings, the Court finds that ArvinMeritor would be unduly prejudiced by allowing Solaia to rely on new opinions offered by Nuschke at this late juncture. The Seventh Circuit teaches that the "expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000). ArvinMeritor has structured its summary judgment motion based on responding to Nuschke's expert opinions offered in his reports and deposition, and it is entitled to rely on those opinions as the framework of the case.

[12] The Court confines its analysis to the statements offered by ArvinMeritor as new or contradictory and statements offered by Solaia in response. Precedent repeatedly teaches that the Court has no duty to scour the record searching for arguments or facts on behalf of a party. *See, e.g., Huynh v. Board of Educ.*, No. 01 C 2893, 2002 WL 500560, at *1 (N.D. Ill. April 2, 2002) (motion to strike denied when movant failed to identify any paragraphs with contradiction; no duty to scour record); *accord Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 n.10 (7th Cir. 2002) ("[I]t is not the duty of this court to ferret through the record for support for [a party's] arguments.").

paragraphs of the Nuschke Declaration: 4, 7, 8, 11, 24 (second sentence), 35-37, 38 (all but third sentence restating claim 11), 39-46, 57 (all but last part citing the Kehres's deposition testimony), 64, 65, 68, 72-76, 77 (second sentence), 78, 79 (last sentence), 80, 81 (all but first sentence), 84 (all but the portion citing the Kehres's deposition testimony), 86, 88, 93, and 94.

The Court declines to strike Nuschke Declaration ¶ 3 because the substance of Nuschke's opinion, the level of ordinary skill in the art, was substantially indicated in his expert report, and that issue is not materially in dispute by the parties.

The Court strikes the first five sentences of paragraph 4 and paragraphs 7 and 8. Solaia argues that Nuschke had "addressed" specially written device drivers and Lotus 1-2-3 in his original and rebuttal reports. While this is true, Nuschke discussed these in a different context and did not express the opinions he gives in the Declaration. For example, Nuschke discussed Lotus 1-2-3 in the context of distinguishing the Welch testimony that Lotus could be combined with CAMM (Solaia Strike Ex. G (Nuschke Rebuttal Report) ¶¶ 23, 24, 27-29), but he did not express any opinion as to the relevance of the general usefulness of particular properties of Lotus (Nuschke Decl. ¶ 7). To the contrary, Nuschke discussed "specially written" device drivers, and his opinion as to the purpose of the patent in alleviating the need for the same (Solaia Strike Ex. H (Nuschke Report) ¶¶ 292-94), which is why the Court declines to strike the second half of paragraph 4 and paragraph 5. The Court could not find anything like the general musings about early manufacturing contained in the first part of paragraph 4 in any of the citations offered by Solaia, and the first five sentences of that paragraph are stricken. The Court declines to strike paragraph 6 as it is merely a restatement of the patent.

The Court strikes paragraph 11 of the Declaration. Solaia argues that this paragraph is a

response to statements made in the Kehres Declaration and ArvinMeritor's brief, and that Nuschke had already discussed "tags" in his report. First, the section of the report that Solaia references is Nuschke's opinion regarding a Rockwell system, not the system that is at issue in this motion. (*See* Nuschke Report ¶ 23.) Second, that paragraph says nothing about the use of "tag" being simply new terminology to mean "spreadsheet." Considering the portions of Nuschke's testimony presented to the Court by Solaia, Nuschke had never before offered his opinion as to why he believes that a tag is the same thing as a cell in a spreadsheet. *See generally* Fed. R. Civ. P. 26(a)(2)(B) (expert report to contain "complete statement of all opinions to be expressed and the basis and reasons therefore"); *Salgado*, 150 F.3d at 742 n.6 ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."). Nor is any information stated by Kehres new information to Solaia that would justify Nuschke's failure to give this opinion until this point in the proceedings. As of June 2003, Solaia had notice that ArvinMeritor planned to argue that a tag in ArvinMeritor's Visual Basic program was not the same as a cell in a general purpose spreadsheet. (*See* ArvinMeritor's Strike Reply Ex. 1 (ArvinMeritor's claim charts) at 13-14.) Thus, Solaia has failed to show that Nuschke did not have information he needed to make his opinion so as to potentially constitute a substantial justification for its late disclosure. The Court declines to strike paragraph 12 as this is just a description of each claim, pointing out what limitations are missing; this is not an opinion.

The Court declines to strike paragraphs 22, 23, and 25, which merely summarize ArvinMeritor's arguments, restate Judge Holderman's claim construction order, and restate deposition testimony, respectively. The Court also declines to strike the first sentence of

paragraph 24 as Nuschke gave the same opinion in his original report. (Nuschke Report ¶ 165.)

The Court strikes the second and third sentences of paragraph 24 as improper opinion for an expert report. The lawyers will argue and the Court will determine whether ArvinMeritor's witnesses admitted or did not admit something. The Court declines to strike paragraph 26, which explains and refutes Kehres's testimony as to "polling" the register to see if the recipe was sent successfully. ArvinMeritor gives no reason for the Court to believe that Solaia would have had notice about this testimony prior to summary judgment, and Solaia therefore has substantial justification for offering Nuschke's new opinion at this time.

The Court strikes paragraphs 35 through 37. Solaia argues that this opinion is merely a longer explanation of what Nuschke stated in his original report at paragraphs 5 and 306, but the Court disagrees. The original report discusses the PLC-to-PC interconnection in distinguishing the Welch/original DDE specification, but it never does so on the basis of defining "directly" in the patent to distinguish "through" from "use." The new explanation of the PLC-to-PC interconnection contained in the Declaration constitutes a new opinion.

The Court strikes paragraphs 38 (all but third the sentence which merely restates claim 11) and 39 through 46. Solaia argues that these statements are responding to ArvinMeritor's arguments in its summary judgment motion, and that the statements are consistent with Nuschke's original report and deposition. Solaia only points the Court to paragraph 5 of Nuschke's original report to support its argument. Paragraph 5 is nothing more than a basic summary of Nuschke's opinions, and it does not contain anywhere near the detailed and effectively new opinions that Nuschke offers in these paragraphs of his Declaration. As the Court has already explained, an expert's report must contain not only his opinion but also his

18

basis therefor. *See* Fed. R. Civ. P. 26(a)(2)(B); *Salgado*, 150 F.3d at 742 n.6 ("If the expert's report contains only incomplete opinions, the court may choose to restrict the expert's testimony to those opinions alone."). The Court declines to strike paragraph 47, as it contains no greater detail regarding the comparison of a "specially written" device driver versus all device drivers than the statement made in paragraph 5.

The Court strikes paragraph 57, except for the portion that simply quotes Kehres's deposition. Solaia argues that this statement is a response to Kehres's statement. The statement is an elaboration by Nuschke on an admission that Solaia got Kehres to make during his deposition (*see* Solaia Strike Ex. 5 (Kehres Dep.) at 64); Nuschke is not refuting anything that Kehres said. Solaia has given no reason for the Court to believe that Nuschke was incapable of giving his opinion *before* Kehres's deposition as to the status of the data at the beginning versus the end of the communication process. Thus, Solaia has not offered a substantial justification for Nuschke's late opinion.

The Court strikes the second sentence of paragraph 77, the last sentence of paragraph 79, all but the first sentence of paragraph 81, and paragraphs 78 and 80 in their entirety. Solaia does not provide the Court with any statements in Nuschke's timely reports on which the Court can rely to conclude that Nuschke's opinions, including Nuschke's "test," are not new and untimely. Solaia again argues that Nuschke is responding to ArvinMeritor's summary judgment argument and to Kehres's admission that there is a version of Lotus 1-2-3 for Windows. These arguments do not constitute substantial justification for the late opinions. Kehres's "admission" is a fact that Nuschke could have (indeed, perhaps should have) known, so Nuschke is not "responding" to Kehres in any meaningful way. In addition, ArvinMeritor has been arguing the difference

19

between systems running in Windows and DOS since at least the June 2003 claim charts were submitted to the Judge Guzman.[13] (*See* ArvinMeritor's Strike Reply Ex. 1 (ArvinMeritor's claim charts) at 9, 16.)

The Court strikes paragraph 84 (except for the portion that only quotes Kehres's deposition) and paragraphs 86 and 88. Solaia directs the court to paragraph 173 of Nuschke's original report and argues that the statements in the Declaration merely support the original opinion and refute ArvinMeritor's summary judgment argument. Paragraph 173 defines a "general purpose spreadsheet" and explains why ArvinMeritor's Visual Basic program is one of them, but the paragraph does not make the argument that recycling the same code, *i.e.* using the same Visual Basic program for the Flex and the PST system, makes it "general purpose." That is a new opinion. The Court declines to strike paragraphs 85 and 87 because they do not constitute opinions.

The Court strikes paragraphs 93 and 94. Solaia points to paragraphs 261 and 262 of Nuschke's original report to demonstrate that these paragraphs are not new opinion. These paragraphs define "general purpose spreadsheet" and explain why Pro Tool is the same, *i.e.* because the cells relate to one another; the statements in the report do not, however, state the opinion that because Pro Tool can be used in so many different applications, it is "general purpose." Solaia has offered no justification for Nuschke's untimely failure to offer this opinion until this point.

The Court declines to strike paragraphs 104 through 122. ArvinMeritor's complaint as to

---

[13] In March 2003, this case was reassigned to this Court from the calendar of District Judge Ronald Guzman.

this portion of the Declaration points to seven pages of the Declaration without specifying the particular portions it believes constitute new opinions. With this request, the Court agrees with Solaia that ArvinMeritor paints with too broad a brush. *See Grady v. Ill. Bell Telephone Co.*, No. 94 C 3115, 1996 WL 473657 at *5 n.5 (N.D. Ill. Aug. 13, 1996) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 579 (2d Cir. 1969)) ("[W]here a motion to strike is 'too general in that it [does] not specify which part of the . . . affidavit should be stricken and why,' the motion need not be granted.") (alteration in original); 10B Wright, Miller & Kane, *Federal Practice & Procedure* § 2738 (3d ed. 1998). A number of the statements challenged by ArvinMeritor do not constitute opinions of any kind which would be prejudicial to ArvinMeritor (*see, e.g.*, Nuschke Decl. ¶¶ 105-106 (summarizing ArvinMeritor's arguments)), and the Court will not scour through the affidavit looking for new opinions without greater clarity provided by ArvinMeritor.

In addition to the statements discussed above that ArvinMeritor challenged as newly disclosed opinions, ArvinMeritor argues that certain portions of the Declaration constitute opinions contradictory to opinions Nuschke gave earlier in the proceedings. "It is by now well-settled that a party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001); *see also id.* ("Consequently, where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken.") (internal quotation omitted); *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996). Of the paragraphs identified by ArvinMeritor as purportedly

21

contradictory (paragraphs 35 through 37, 82 through 92, and 93 through 103), the Court declines to strike all but paragraph 90.

In paragraphs 82 through 92, Nuschke discusses the relevancy of the content of the graphical display to his conclusion of infringement. ArvinMeritor argues that this is contradictory to Nuschke's deposition testimony. In the portions of the deposition cited by ArvinMeritor (*see* ArvinMeritor Strike Ex. 3 at 184-85), Nuschke states that the content of the display is not relevant, but that the information displayed on the screen *is* relevant "given that there is information content there, [which] is an indication that things are going on within the control program." (*See id.* at 194:18-21.)

The only contradictory statement identified by the Court is Nuschke's statement that the display, *i.e.* the rows and columns displayed on the screen (as compared to the information in the display), demonstrates that the Flex and PST systems have a spreadsheet program. (Nuschke Decl. ¶ 90.) Thus, the Court strikes that statement. That the content is relevant, *i.e.* that boxes on the screen contain tags, is not contradictory to Nuschke's earlier testimony.

The Court has carefully scrutinized the remaining paragraphs identified by ArvinMeritor, and although the statements in the Declaration sometimes elaborate in more detail opinions stated earlier, the Court finds nothing contradictory in the opinions. The Court declined to scrutinize paragraphs 93 through 103, however, on the grounds that ArvinMeritor, again, has made too general an objection. ArvinMeritor accuses Nuschke of "chang[ing] his position on the Rabofsky system in his declaration, articulating different contentions, based on different documents, than in his depositions and original report." (Motion to Strike at 12.) ArvinMeritor then points the Court to 9 pages of deposition testimony and 44 pages of Nuschke's original

22

report to compare with 4 ½ pages of the Declaration. In light of the vagueness of the objection, the Court will not scour the record looking to make specific arguments on ArvinMeritor's behalf.

D.    *Daubert* Challenge

In the final argument in its Motion to Strike, ArvinMeritor challenges Nuschke's competency to testify as an expert under the standards set out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny. ArvinMeritor argues that certain portions of the Declaration are incorrect, that Nuschke has disclaimed being an expert on particular topics in the Declaration, and that one opinion is mere *ipse dixit* lacking factual support.

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "The Supreme Court in *Daubert* interpreted this rule to require that 'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but is reliable." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (quoting *Daubert*, 509 U.S. at 589). The job of the court is "to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Id.* (citing *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)). In determining a purported expert's competence to testify, the Seventh Circuit instructs that "[t]he soundness of

the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.*

The Seventh Circuit teaches that "[a] district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience or education with the subject matter of the witness's testimony.'" *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

ArvinMeritor challenges whether Nuschke is qualified to testify as an expert concerning Windows programming and DDE protocol.[14] Nuschke stated in his expert report that he has a degree in electrical engineering, and that he founded a company that "designs and develops software and hardware systems that are used by OEM's[15] primarily for industrial control." (Solaia's Strike Ex. E (Nuschke Report) at ¶¶ 1-2.) Nuschke claims to have "extensive experience designing industrial control systems, including systems that work in conjunction with Programmable Logic Controllers," and to be a "proficient programmer in several languages in

---

[14] "DDE" is Dynamic Data Exchange, an operating system tool that allows one program to communicate with another program running on the computer. (*See* D.E. 572 (Kehres Decl.) ¶ 12.)

[15] Nuschke does not define "OEM," but an Internet search revealed that the term refers to original equipment manufacturers. *Webopedia: The #1 Online Encyclopedia Dedicated to Computer Technology*, "OEM" (available at http:\\www.webopedia.com, last visited March 15, 2005). An OEM is "a company that has a special relationship with computer producers. OEMs buy computers in bulk and customize them for a particular application." *Id.*

addition to extensive hardware design experience." (*Id.* ¶ 2.) During a deposition taken in *Solaia Technology LLC v. American Honda Motor Co.*, No. 03 C 989 (N.D. Ill., filed Feb. 10, 2003), which also centered on the '318 patent, however, Nuschke specifically disclaimed being an expert in the specific areas of Windows and DDE protocol. Nuschke responded to questions regarding Windows by stating, "[Y]ou're asking me detailed questions that would be the area of a Windows' programmer, which I'm certainly not a Windows' programmer." (ArvinMeritor's Strike Ex. 6 (Nuschke Dep. in *Solaia Tech., LLC v. Am. Honda Motor Co.*, Mar. 30, 2004) at 52:9-12.) Nuschke followed up by stating, "[I]f this were in any way an issue of Windows' programming or, you know, code, that sort of thing, then I would probably decline to participate. . . . I'll just say that I don't think that I would be the right person to bring in if we were having a big discussion about some details of Windows." (*Id.* at 52:23 -53:2, 54:1-4.) In a deposition taken on a later date, Nuschke engaged in the following colloquy regarding DDE protocol:

Q:     Do you consider yourself an expert in the area of DDE protocol?

A:     Oh, no. I don't know, definitely not.

Q:     Definitely not?

A:     I'm not an expert. An expert would be someone who is writing programs on a daily basis with DDE, which I am not doing. I have people that work for me that do that, and we discuss various issues. But I am not a, just by the nature of the beast, I'm not a DDE expert, no.

(ArvinMeritor's Strike Ex. 7 (Nuschke Dep. in *Solaia Tech., LLC v. Am. Honda Motor Co.*, May 26, 2004) at 254:20 - 255:5.) Solaia responds to ArvinMeritor's challenge by merely pointing to Nuschke's general qualifications in the area of industrial controls.[16] Solaia does not attempt to

---

[16] Solaia does point to portions of Nuschke's deposition where he discusses his *familiarity* (as opposed to his *expertise*) regarding DDE, but these statements hurt rather than

reconcile Nuschke's disclaimers in *American Honda* with his statements of purported expertise

in this case (such as, for example, by offering an affidavit by Nuschke explaining why his

disclaimers went to topics other than those offered by him in this case).[17]

Nuschke's specific disclaimers, coupled with Nuschke's explanation of his general

expertise in the area of industrial control (without indication of expertise in areas related to

Windows or DDE protocol), are sufficient to convince the Court, on the record presented, that

Nuschke "knows not whereof he speaks" in matters regarding Windows and DDE protocol.

*Bammerlin*, 30 F.3d at 901. In *Jones v. Lincoln Electric Co.*, the Seventh Circuit held that a

district court abused its discretion in concluding that a witness was an expert. *Id.*, 188 F.3d at

724. In *Jones*, the defendant tendered a witness who specialized in material science and

metallurgy to testify as to the toxicity of certain chemicals and the lung's ability to absorb the

chemicals. In finding that the witness was not qualified to testify on that topic, the Seventh

Circuit relied, in part, on the fact that the witness acknowledged on cross-examination that he

was not a toxicologist and that the areas to which he spoke were "outside his expertise." *Id.*

---

help Solaia's case. (*See* ArvinMeritor's Strike Ex. 1 (Nuschke Dep.) at 82:5-13 ("Q: Do you
understand how to program using DDEML? A: Yes, I've – yes, I'm familiar with programs
using DDE, yes. Q: Have you written programs using DDE? A: I – yes. Well, actually my
employees have written programs that use DDE. My involvement has been more from a
managerial standpoint.").) Solaia also points to places in Nuschke's deposition where he
discusses his *familiarity* or *understanding* of various aspects of Windows (*see id.* at 83:1 - 84:14;
90:6-12; 95:16-22; 102:19-23; 247:4-10; 298:4- 299:6), but Solaia has not provided the Court
with any testimony by Nuschke as to his *expertise* regarding Windows.

[17] The party offering the expert's testimony must establish by a preponderance of the
evidence that the expert testimony is admissible and that the expert is qualified. *See Daubert*,
509 U.S. at 593; *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999)
("[T]he proponent of the testimony does not have the burden of proving that it is scientifically
correct, but that by a preponderance of the evidence, it is reliable."); *Stasior v. Nat'l R.R.
Passenger Corp.*, 19 F. Supp. 2d 835, 845 (N.D. Ill. 1998).

Likewise, Nuschke's qualifications to testify as to industrial controls generally do not give him sufficient expertise to testify about areas in which he has admitted he has no expertise. *Accord Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (affirming trial court's ruling that purported expert could not testify where the court noted, *inter alia*, that witness admitted that he was not expert in areas pertinent to damages modeling).

Thus, the Court strikes paragraphs 64, 65, 68, 72-76, 77 (second sentence), 78, 79 (last sentence), 80, 81 (all but the first sentence), 84 (all but the portion restating Kehres's deposition testimony), 86, 88, 93, and 94.[18]

ArvinMeritor's also argues that several opinions in the Nuschke Declaration are wrong. (*See* Motion to Strike at 14-16 ("The assertion in Nuschke's Declaration that the Roseman add-in program can run in Windows 2000 using NDIS [¶¶ 78-81] is wrong and unfounded. . . . Nuschke's description of how 'interrupts' were handled in the DOS era and whether DOS was used to handle 'interrupts' (¶ 46) is unequivocally wrong. . . . Nuschke's contentions regarding DDE in various places (¶¶ 58-76), but especially ¶ 65, are technically wrong.").[19]) The Court has already struck the opinions contained in these statements on other grounds, as described above, so it need not decide whether it is also proper to strike these paragraphs because of any purported inaccuracy. The Court notes, however, that the Seventh Circuit clearly instructs that it is not the

---

[18] These statements and partial statements are those which ArvinMeritor challenged and the Court determined related to Windows or DDE protocol, minus the portions that merely reiterate ArvinMeritor's arguments or restate the testimony of other witnesses.

[19] ArvinMeritor also states that "Nuschke improperly refers to the add-in program as a 'device driver,' a mistake no one in the industry would make and which is completely unsupported," but ArvinMeritor does not ask the Court to strike a particular paragraph. The Court will not scour the record and speculate as to which paragraphs of the Declaration ArvinMeritor challenges.

province of the district court to determine whether an opinion is right or wrong. *See Smith v. Ford Motor Co.*, 215 F.3d at 718.

Finally, ArvinMeritor challenges paragraphs 48 and 49 on the grounds that Nuschke's opinion as to "special device drivers" is unsupported *ipse dixit*. The Court agrees that Nuschke offers no explanation as to the source of his opinion to comport with the strictures of Rule 702. The Seventh Circuit has repeatedly instructed that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419-420 (7th Cir. 2005) (collecting cases). Thus, the Court strikes paragraphs 48 and 49.

IV.  ArvinMeritor's Motion for Summary Judgment of Non-Infringement

ArvinMeritor moves for summary judgment of non-infringement against Solaia. ArvinMeritor argues that the accused systems omit explicitly claimed elements and do not infringe the claims. ArvinMeritor also argues that the accused systems incorporate features explicitly disclaimed and surrendered and thus cannot infringe the '318 patent as a matter of law. For the reasons explained below, the Court grants ArvinMeritor's motion.

A.  Legal Standards

Summary judgment is appropriate in a patent case, as in any other case, where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998). Summary judgment is proper where, based on the evidence put forward by the nonmovant, no reasonable jury could find that the alleged infringer's product or process infringes

the patent. *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intern., Inc.*, 389 F.3d 1370, 1376 (Fed. Cir. 2004); *Pugh v. City of Attica,* 259 F.3d 619, 625 (7th Cir.2001) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)); *see also Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997). "Because the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial burden either by providing evidence that would preclude a finding of infringement, or by showing that the evidence fails to establish a material issue of fact essential to the patentee's case." *Cannon Rubber Ltd. v. First Years Inc.*, No. 03 C 4918, 2004 WL 2533720, at *2 (N.D. Ill. Sep. 28, 2004) (citing *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 807 (Fed.Cir.1999)).

"The determination of infringement is a two-step analysis: (1) claim construction to determine the scope and meaning of the claims asserted to be infringed, and then (2) a determination of whether the properly construed claims encompass the accused device." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed. Cir. 1999); *accord Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1302 (Fed. Cir. 2004). The patentee has the ultimate burden of proving that the accused device meets each and every element of the asserted claims, either under literal infringement or the doctrine of equivalents. *Deering Precision Instruments, LLC v. Vector Distr. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003); *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Summary judgment of noninfringement is thus proper "where there is no genuine issue as to whether the accused device lacks a single claim element or its equivalent." *Cannon Rubber*, 2004 WL WL 2533720, at *2 (citing *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003)); *see also Litton Sys., Inc. v.*

*Honeywell, Inc.*, 140 F.3d 1449, 1554 (Fed. Cir. 1998) (absence of a single element in the accused device precludes a finding of infringement).

Claim limitations may be written in a "means-plus-function" format, as governed by 35 U.S.C. § 112, ¶ 6. Under that provision, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. Claim construction under a means-plus-function format consists of identifying the claimed function and the corresponding structure of each claim. *WMS Gaming Inc. v. Int'l Game Technology*, 184 F.3d 1339, 1347 (Fed. Cir. 1999).

To literally infringe a means-plus-function limitation, the accused device must "perform the identical function as specified in the claims." *WMS Gaming*, 184 F.3d at 1347 (quoting *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 1039, 1042 (Fed. Cir. 1993) (internal quotation omitted). If it performs the identical function, an accused device literally infringes only if it is "insubstantially different" from the corresponding structure in the patent specification. *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) (citing, *inter alia*, *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999)). The "insubstantial difference" analysis is a modified version of the function-way-result methodology described in *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). *See Kemco Sales*, 208 F.3d at 1364. "Thus, [t]wo structures may be 'equivalent' for the purposes of section 112, paragraph 6 if they perform the identical function, in substantially the same way, with substantially the same result." *Id.* (citing *Odetics*, 185 F.3d at 1267).

A device may also infringe a claim written in means-plus-function format under the doctrine of equivalents. This analysis differs from literal infringement only in that the identical function is not required—the equivalent "need only perform a substantially similar function." *See Kemco Sales*, 208 F.3d at 1364. If, however, "a court determines that the 'way' and/or 'result' is/are substantially different under a section 112, paragraph 6 equivalents analysis, a patentee cannot prevail under the doctrine of equivalents for the same reason(s)." *Id.* at 1365.

B.    Analysis

The Court begins by noting that Arivinmeritor has premised its summary judgment motion ("Motion") on the construction of certain claims of the '318 patent made by another judge in an order entered pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), in a separate lawsuit. (*See* ArvinMeritor's Ex. 7 (*Solaia Technology v. Jefferson Smurfit*, No. 01 C 6641 (order) (N.D. Ill. March 28, 2002) (Holderman, J.)) ("*Jefferson Smurfit* Order").) ArvinMeritor states in the Motion before the Court that "ArvinMeritor respectfully disagrees with certain aspects of that claim construction," and it offers the court an exhibit in which it recites its "views" as to the proper claim construction "in the event that the Court intends to look afresh at the claim construction issue." (D.E. 569 (ArvinMeritor Motion) at 17; *see* ArvinMeritor's Ex. 8.) This "exhibit" is, in fact, a separate legal brief in which ArvinMeritor offers 14 pages of argument as to claim construction. In light of ArvinMeritor's decision to apply the *Jefferson Smurfit* claim construction for the purposes of this summary judgment motion (*see* ArvinMeritor Motion at 17) and Solaia's apparent agreement to the same (*see* D.E. 606 (Solaia Response) at 9-12), the Court, for the purposes of this Motion, will not revisit the claims

31

that have already been construed,[20] and the Court will disregard the procedurally improper "exhibit" presented by ArvinMeritor.

The Federal Circuit teaches that when a claim construction is agreed to by the parties, a court may decline to raise the issue *sua sponte*. *Cf. WMS Gaming*, 184 F.3d at 1348 n.2 ("[W]here, as here, the parties agree to a claim construction that is adopted by the district court, and neither party disputes that construction on appeal, we decline to raise an issue *sua sponte* that the parties have not presented.") (citing *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1991)). Putting aside ArvinMeritor's procedurally improper "exhibit," which was, in the Court's view, simply an attempt to add an additional 14 pages of legal argument to its already lengthy brief, ArvinMeritor has declined to fully brief the issue of claim construction. The Court is not inclined to address an issue not properly briefed by the parties, especially where, as here, the parties agree (at least in principle) that the Court need not do so. Thus, to the extent that the *Jefferson Smurfit* Order addresses the claims at issue in this Motion, the Court will confine itself to that claim construction for the purposes of this Motion.

---

[20] Because the Court agrees with ArvinMeritor that it is entitled to summary judgment under the *Jefferson Smurfit* claim construction, the Court need not address construction issues decided in the previous litigation. The Court reserves the right to revisit the *Jefferson Smurfit* construction with respect to ArvinMeritor, if appropriate, in future instances, as the Court is not, as Solaia suggests, bound by the *Jefferson Smurfit* construction. At a minimum, as ArvinMeritor was not a party to the *Jefferson Smurfit* litigation, it is not collaterally estopped from litigating the claim construction of the '318 patent. *See Vardon Golf Co. v. Karsten Mfg. Corp.*, 294 F.3d 1330, 133 (Fed. Cir. 2002) ("Under Seventh Circuit law, collateral estoppel, or issue preclusion, prevents a party from litigating an issue if: (1) the issue sought to be precluded is the same as that involved in an earlier action; (2) the issue was actually litigated; (3) determination of the issue was essential to a final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action.") (collecting Seventh Circuit cases); *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994) ("To apply issue preclusion, the party against whom the estoppel is being asserted must have been accorded a full and fair opportunity to litigate in the prior court proceeding the very issue he now seeks to relitigate.").

1. Spreadsheet Instruction Means and Spreadsheet Means

Claims 11 and 12 each contain a limitation relating to use of a spreadsheet program or spreadsheet. ArvinMeritor argues that it is entitled to summary judgment as to both claims 11 and 12 because neither the Flex/PST nor the Rabofsky system utilizes a spreadsheet program, and, therefore, those systems do not meet the limitations described above. Solaia responds that the programs used by ArvinMeritor to control their systems *are* spreadsheet programs, or, in the alternative, the structural equivalent of such.

a. Claim 11's "Spreadsheet Instruction Means"

The *Jefferson Smurfit* Order construed the "spreadsheet instruction means" limitation of claim 11 as follows: The claimed function is "'effecting a general purpose spreadsheet program in said computer providing cells into which said operator can insert information and menu commands selectable by said operator[,] normally only being able to effect movement of information between fields of data contained in said memory and said cells.'" (*Jefferson Smurfit* Order, ¶ 5 (citing '318 patent, col. 16, line 68 – col. 17, line 6) (internal alteration omitted).) The corresponding structure is "the 'instruction storage memory' of a personal computer containing the instructions to effect a general purpose spreadsheet program." (*Id.* (citing '318 patent, col. 4, lines 51-54).)

The *Jefferson Smurfit* Order did not construe the term "general purpose spreadsheet program." ArvinMeritor argues that a spreadsheet program is "[a] program that displays a table of cells arranged in rows and columns, in which the change of the contents of one cell can cause recomputation of one or more cells based on user-defined relationships among the cells." (D.E. 569 (ArvinMeritor Motion) at 20 (citing *IBM Dictionary of Computing* 641 (George McDaniel

33

1993) at 641.) Solaia bases its definition of the term "spreadsheet program" on the statements of three experts. Citing to a statement by Walter Nuschke, Solaia argues that a "spreadsheet program" is "simply a multi-purpose program which presents cells which can be related to one another." (D.E. 606 (Solaia Resp. Br.) at 32.) Solaia points to Kevin Welch, who defined a spreadsheet as "a tool used in financial analysis and modeling that establishes mathematical relationships among numbers and formulas that appear in rows and columns." (Solaia's Ex. 2 (Welch Dep.) at 255:8-11.) Solaia says this definition is consistent with Jeffery Kehres's understanding that "[a] general purpose spreadsheet . . . is a program or application that [] has cells that are interrelational. If you change one cell, it can manipulate data in another." (Solaia's Ex. 5 (Kehres Dep.) at 11:4-6.)

In construing a patent term, "words in a claim are generally given their ordinary and customary meaning," unless the patentee has chosen to be his own lexicographer by using terms in a manner other than their ordinary meanings. *Vitrionics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Here, the patentee has not used "spreadsheet program" in a way other than its ordinary meaning. It has not been defined in the specification, and the Court thus construes it as would a person of ordinary skill in the art. The Federal Circuit teaches that "dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital Sys., Inc. v. Telegenix*, 308 F.3d 1193, 1202 (Fed. Cir. 2002) (collecting cases). These sources provide "unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation." *Id.* at 1203. Thus, the Court will give

34

weight to the dictionary definition offered by ArvinMeritor as the potential definition for "spreadsheet program."

Next, the Court looks, as precedent directs, to the intrinsic evidence to determine whether there is any reason to believe that the ordinary and customary meaning of the term is rebutted or modified. *Texas Digital*, 308 F.3d at 1204; *Vitrionics*, 90 F.3d at 1582. Here, the patentee has not used "spreadsheet program" in any way that contradicts the ordinary meaning as defined by the technical dictionary. The Summary of the Invention states, "The spreadsheet program provides many mathematical arguments that can be arranged to perform complex calculations rapidly in determining desired efficiencies and qualities of manufacturing." ('318 patent, col. 5, lines 49-52.) The preferred embodiment of the invention uses the commercially-available Lotus 1-2-3, a protypical general purpose spreadsheet program available at the time. (*Id.*, col. 6, line 67 – col. 7, line 1.) The Court found nothing in the intrinsic record that would indicate that "general purpose spreadsheet program" means anything other than its ordinary and customary meaning.

Solaia's proposed definition—a multi-purpose program which presents cells which can be related to one another—is so broad as to read out the limitation of a "spreadsheet program" altogether. While Solaia's argument that a patentee is "not required to include within each . . . claim[] all the [the] advantages or features described as significant or important in the written description" is well-taken, *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004), a court cannot ignore the limitations inherent in the language the patentee chooses to use. This case is unlike the patentee in *Golight*, who had described more features in his written description but then wrote the claims without those features. *See id.* (claim function of "rotating said lamp unit in a horizontal direction" did not include limitation of rotating through at least

35

360°.) Here, the term "spreadsheet program," as defined in its ordinary and customary meaning, includes limiting features, namely the display of cells that can be arranged in rows and columns, in which the change of the contents of one cell can cause recomputation of one or more cells based on user-defined relationships among the cells.[21] Nothing need be implied from the written description of the patent. Had the patentee desired to claim a program broader in function than a "spreadsheet program," he was perfectly free to do so (or at least attempt to do so). But when a patentee uses language that is limiting, the Court must give meaning to that limitation.[22] *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ("All the limitations of a claim must be considered meaningful.").

Thus, for the purposes of claim 11's "spreadsheet means" function, "spreadsheet program" means a program that displays a table of cells arranged in rows and columns, in which the change of the contents of one cell can cause recomputation of one or more cells based on user-defined relationships among the cells. In addition, the Court construes "general purpose" in its ordinary and customary meaning of not being intended or used for a single purpose. No

---

[21] Other dictionary definitions of "spreadsheet" from the relevant time period also include the functionality of recalculation of other cells as part of the definition. *See, e.g., Dictionary of Computing* 358 (Oxford University Press 1986); *Dictionary of Information Technology* 318 (Dennis Longley and Michael Shain 1986). Indeed, one of the expert definitions offered by Solaia include this capability. (Solaia's Ex. 2 (Welch Dep.) at 255:8-11 (defining a spreadsheet program as a "a tool used in financial analysis and modeling that establishes mathematical relationships among numbers and formulas that appear in rows and columns").)

[22] Solaia's proposed definition also contradicts the patent's explicit differentiation of spreadsheet programs from other types of programs, such as a database or other analysis program, that can be used to transfer information. (*See* '318 patent, col. 3, lines 1-8 (reciting prior art systems which transfer information between the operating system program and "popular and commercially available spreadsheet, data base and analysis programs" and which allow for control of the processes "from the spreadsheet, data base or data analysis program").)

dictionary is necessary to understand the plain meaning of "general purpose" from the context of the patent. This meaning is consistent with the use of Lotus 1-2-3 as the general purpose spreadsheet program in the preferred embodiment, as that program was developed and used for a variety of applications outside the manufacturing context.

Therefore, the Court construes the "spreadsheet means" function of claim 11, in pertinent part, as "effecting a program, one not intended or used for a single purpose, that displays a table of cells arranged in rows and columns, in which the change of the contents of one cell can cause recomputation of one or more cells based on user-defined relationships among the cells, in said computer providing cells into which said operator can insert information and menu commands selectable by said operator." The question of infringement, therefore, is whether Solaia has produced evidence that creates an issue of material fact as to whether ArvinMeritor's systems have an identity of function with this claim limitation. As explained below, it has not.

i.      No "Spreadsheet Program"

Solaia has not adduced evidence that creates an issue of fact as to whether ArvinMeritor's systems effect a general purpose spreadsheet program. There is simply insufficient evidence for a reasonable jury to conclude that the VB program in the Flex/PST systems or the Simatic Pro Tool program in the Rabofsky system are general purpose spreadsheet programs. Solaia offers three reasons as to why the VB program in the Flex/PST system is a "spreadsheet program": it uses cells for user input; those cells are arranged in columns and rows; and it is capable of performing calculations.

Even assuming that the text boxes in the visual display of the VB and Simatic Pro Tool programs constitute "cells" within the meaning of the definition of spreadsheet, Solaia's

37

argument that the VB program is capable of performing calculations is unsupported by record evidence in this Motion. Solaia offers the Court with a single page of testimony by Welch that provides no context for the Court. The entire relevant testimony provided to the Court states:

> Q    Okay. And you say, with some effort, this calculation can be performed if one associates the values of these two numbers with named tags and create a third derived tag, right?
>
> A    Yes.
>
> Q    And so – did you do that?
>
> A    Yes.
>
> Q    Okay. So you made a tag that added the value of two other tags, correct?
>
> A    Right.

(Solaia's Ex. 2 (Welch Dep.) at 261:1-10.) This testimony, it clearly appears, does not refer to the VB or Simatic Pro Tool programs. A reading of the previous portion of Welch's testimony provided indicates that Welch was referencing the RSView program that is part of a Rockwell system—a program that not at issue in this Motion. (ArvinMeritor's Ex. J (Welch Dep.) at 259:2 - 261:12.) Solaia has offered no other evidence that the "cells" in the VB or Simatic Pro Tool programs, into which the specifications are input, are capable of interrelating to each other such that a change in one cell can cause recomputation of one or more cells based on user-defined relationships among the cells. If the VB and Simatic programs do not effect a program with this defining characteristic, it has not effected a "spreadsheet program."

## ii.    Not "General Purpose"

Moreover, even if the VB and Simatic Pro Tool programs are "spreadsheet programs," Solaia has not produced evidence that creates an issue of fact as to whether they are "general

38

purpose" programs. This provides an independent basis for summary judgment in ArvinMeritor's favor.

In this regard, Solaia argues that the programs are "general purpose" because they are designed to handle numerous different recipes. The Court rejects this argument, first, because it is based solely on testimony by Nuschke that the Court struck, above, as new, improper opinion testimony. (*See* Nuschke Decl. ¶¶ 84, 86, 88, 89, 93, 94.) Even if the Court were to consider the testimony, however, it is unpersuasive. Solaia has produced no evidence that the VB and Simatic Pro Tool applications may be used for any purpose other than what those programs are being used for: transmitting data used to monitor and control a manufacturing system. Reading "general purpose" as Solaia suggests would be like saying that a saw blade made to cut steel is a "general purpose" blade because it can cut three kinds of wood, as contrasted with, say, a saw blade that actually was a "general purpose" blade because it could cut steel, wood, and plastic. Here, there is no evidence from which a jury could find that these programs can be used outside the particular context of transferring data from a user's input to a network of PLCs. Thus, the VB and Simatic Pro Tool programs are not "general purpose" spreadsheet programs.

Thus, Solaia has not created a genuine issue of fact as to whether the ArvinMeritor systems effect a general purpose spreadsheet program, and therefore, has failed to adduce evidence that creates a triable issue of fact as to whether there is an identity of function between the ArvinMeritor systems and claim 11. *See WMS Gaming*, 184 F.3d at 1347. In short, summary judgment of non-infringement is proper on claim 11. As explained above, it is warranted on two independent bases: Solaia has failed to present a triable issue as to whether ArvinMeritor's systems perform the function claimed in the "spreadsheet instruction means" because (1) no

39

reasonable jury could find that the programs effect a "spreadsheet program"; and (2) even if there were a triable issue on that question, no reasonable jury could find that the programs effect a "general purpose" spreadsheet program.

> b.    Claim 12's "Spreadsheet Means"

The "spreadsheet means" limitation of claim 12 was construed in the *Jefferson Smurfit* Order as follows: The claimed function is "'presenting a spreadsheet of cells into which information can be inserted to facilitate executing actions through said spreadsheet means, said spreadsheet means being capable of accessing said registers in said processor means through said actions.'" (*Jefferson Smurfit* Order (citing '318 patent, col. 17, lines 38-43).) The corresponding structure is the same as that identified for claim 11's spreadsheet instruction means, namely "the 'instruction storage memory' of a personal computer containing the computer instructions to effect a general purpose spreadsheet program." (*Id.* (citing '318 patent, col. 4, lines 51-54).)

Neither party argues that there is an identity of function for this means-plus-function claim, arguing instead about whether the systems contain the corresponding structure. Because "[f]unctional identity and either structural identity or equivalence are *both* necessary" for infringement of a section 112, ¶ 6 claim limitation, *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (citing *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) (*en banc*)) (emphasis in original), the Court need not decide whether there is functional identity as it finds that no reasonable jury could find structural equivalence based on the evidence presented.

ArvinMeritor argues that its systems do not use a general spreadsheet program. Solaia counters with the conclusion that "[t]here is a 'spreadsheet means contained in said processor

40

means'" in ArvinMeritor's systems, offering for support Nuschke's opinion that the corresponding structure of this function (or, at least, its equivalent) exists in the Flex/PST systems. (*See* Solaia Resp. Br. at 41.) Nuschke states that "both the Flex and PST systems contain spreadsheet cells, namely tag values in what ArvinMeritor called 'text boxes,' that can be displayed on a computer screen where logical relationships exist between the cells. In both [systems], a part number is entered on the screen, and immediately causes additional spreadsheet cells to display parameters about the manufacture or testing of that part." (Nuschke Decl. ¶ 92). This opinion is insufficient to create a triable issue of fact as to whether the ArvinMeritor systems contain an equivalent structure to that corresponding to claim 12's spreadsheet means function, instruction storage memory containing instructions to effect a general purpose spreadsheet program. For the reasons described above, the VB and Simatic Pro Tool programs do not contain instructions that effect "general purpose spreadsheets," so the question remaining is whether the ArvinMeritor programs are the equivalent of the general purpose spreadsheet program disclosed in the patent.

An expert's assertion as to the ultimate question of infringement is insufficient to raise a genuine issue of material fact where the expert fails to "set forth a factual foundation for his opinion . . . in sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the nonmovant." *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 147-48 (Fed. Cir. 2000). The only factual basis given for Nuschke's opinion is that the text boxes visible in the visual displays of the VB and Simatic Pro Tool programs are cells. Nuschke offers no basis for his opinion that a logical relationship exists

between the cells.[23]   Nuschke points to no evidence, for example, that the values in the cells are or can be interrelated in the "way" contemplated by a spreadsheet program as defined above. *Compare, e.g., Odetics*, 185 F.3d at 1270 (finding expert testimony provided substantial evidence to support jury verdict where expert offered detailed explanation of opinion as to equivalence, including that the "way" the structures accomplished claimed function and the "result" of that function were substantially equivalent).   That a user can enter a part number that calls up the values of specifications to the text boxes (or "cells") does not indicate that the program is capable of manipulating the values in the cells by changing one value so as to produce subsequent recomputation of other values.

Solaia offers no evidence other than Nuschke's opinion on this issue.   At this point it is necessary to reiterate the responsibility Solaia bears in this summary judgment proceeding. Precedent repeatedly teaches that "summary judgment is 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003)). Solaia, which bears the ultimate burden of proving infringement, has offered no evidence that the VB and Simatic Pro Tool programs are "insubstantially different" from a spreadsheet program. *See Kemco Sales*, 208 F.3d at 1364 (citing, *inter alia, Odetics*, 185 F.3d at 1267).   For example, Solaia points to the presence of cells (the text boxes which the Court will assume are "cells" as

---

[23] In his Declaration, Nuschke relies, in part, on the Welch deposition testimony regarding derivative tags. (*See* Nuschke Decl. ¶ 91 (citing Solaia's Ex. 2 (Welch Dep.) at 262).) As described above, this testimony related to an entirely different program, RSView, and does not provide support for a conclusion that the ArvinMeritor systems at issue in this Motion can perform calculations using the text boxes in the visual displays.

recited by the function) in rows and columns in the visual display of the ArvinMeritor programs as proof of structural equivalence to the general purpose spreadsheet program disclosed as structure in the patent. But Solaia has not indicated how the mere presence of cells would enable to a trier of fact to conclude that the ArvinMeritor programs function in substantially the same way as the general purpose spreadsheet program disclosed in the patent. *See id.* There is no evidence that it is the cells themselves that allow the general purpose spreadsheet program to perform the function of the spreadsheet means—as opposed to, for example, the functionality of the disclosed spreadsheet program that enables it to "facilitate executing actions."[24] (*See* '318 patent, col. 17, line 40.)

In the absence of such evidence that the cells in the ArvinMeritor programs are the reason those programs function in substantially the same "way" as the disclosed structure (if indeed those programs even do function in substantially the same way at all), no reasonable jury could conclude that there is an "insubstantial difference" between the general purpose spreadsheet program and the ArvinMeritor systems on the factual basis provided by Nuschke for his opinion.

---

[24] In the preferred embodiment, the corresponding structure to the spreadsheet means, the general purpose spreadsheet, allowed a user to enter "@ functions" into cells to execute actions. ('318 patent, col. 4, lines 56-58 ("The displayed spreadsheet presents cells into which the user can insert information and @ functions to execute desired arguments."); *id.*, col. 8, lines 12-14 ("Spreadsheet program 26 inserts cells, menu driven commands and @ functions that can be inserted into cells."); *id.*, col. 3, lines 61-64 ("These @READ and @WRITE functions become executed simply upon recalculating the displayed spreadsheet to effect the information transfers.").) The patent describes multiple @functions that are used to execute actions. For example, "[an @READ function] command in cells of the displayed spreadsheet causes the addressed PLC to transmit the information contained in certain addressed registers directly into that cell or relatively addressed cells in the displayed spreadsheet." (*Id.*, col. 3, lines 56-61). Similarly, @WRITE function commands in cells of the displayed spreadsheet "transfer information contained in that cell or information contained in relatively addressed cells to be written into desired and addressed PLC registers." (*Id.*, col. 3, lines 52-56) Other @functions are provided to execute various desired arguments. (*Id.*, col. 8, lines 63-68.)

Thus, Solaia has failed to identify evidence in the record presented that creates a material issue of fact as to the equivalence of the VB and Simatic Pro Tool programs with the disclosed general purpose spreadsheet. Summary judgment is therefore proper as to claim 12.

2.      Messages Indicating the Condition of Equipment

Even if the Flex/PST systems infringe claim 11 because the VB program effects a general purpose spreadsheet, summary judgment is proper as to those systems on the independent ground that the PLCs in those systems do not send messages indicating the condition of the equipment to which the PLCs are coupled. Claim 11 includes two elements with limitations relating to messages indicating the condition of factory equipment being transmitted from the PLCs. Claim element 11[A] requires "a plurality of programmable logic controllers coupled to the equipment, said programmable logic controllers each transmitting messages on a network indicating the condition of said equipment." ('318 patent, col. 16, lines 46-49.) Claim 11[E] requires an "add-in instruction means . . . for presenting add-in menu commands . . . operating through said spreadsheet means . . . to move said messages . . . to respective assigned cells in said spreadsheet instruction means so that messages from said programmable logic controllers indicating the condition of said equipment can be saved and moved directly to said cells." ('318 patent, col. 17, lines 8-22.) The limitation in the claim elements regarding messages "indicating the condition of said equipment" was not construed as part of the *Jefferson Smurfit* litigation. Section 112, ¶ 6 is not applicable to this phrase, so ordinary claim construction principles apply.[25] *See IMS Tech.*,

---

[25] Claim 11[A] is not written the mean-plus-function format. In claim 11[E], the phrase "indicating said equipment" merely modifies the noun "messages." That descriptor is not part of the means that causes, for example, the presentation of add-in menu commands or the movement of messages.

44

206 F.3d at 1432-33 (section 112, ¶ 6 "applies only to interpretation of the means or step that performs a recited function," not to all terms within that means). The parties do not specifically dispute the meaning of this limitation, both pointing the Court to the ordinary meaning of the terms. *See E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1367 (Fed. Cir. 2003).

The ordinary meaning of "condition" is the state of repair or ability to function of an object. *See, e.g., The New Oxford American Dictionary* 357 (Elizabeth J. Jewell and Frank Abate, eds., 2001) (defining "condition" as, *inter alia*, "the state of something, esp. with regard to its appearance, quality, or working order"). The meaning of "said equipment" is unambiguous from the language of the patent: it is the equipment to which the PLCs are coupled. (*See* '318 patent, col. 16, lines 46-47.) There is nothing in the intrinsic record that indicates the phrase "indicating the condition of said equipment" should be given anything other than its ordinary meaning. *See WMS Gaming*, 184 F.3d at 1350.

The parties dispute whether this claim limitation reads on the accused Flex/PST systems. (ArvinMeritor does not make this argument regarding the Rabofsky system.) ArvinMeritor offers evidence that forms a factual basis for its conclusion that the Flex/PST systems do not send messages from the PLCs to the spreadsheet (assuming for the purposes of this discussion that the Flex/PST systems use a spreadsheet program) indicating the condition of the equipment to which the PLCs are coupled. According to testimony by expert Jeffrey Kehres,

> The VB program does not receive any data back from the PLCs regarding the equipment attached to the PLCs. The program is only used to load recipes into the PLCs. The VB program does check to determine if the recipe data was received by the PLC . . . by reading a status bit (a '1' or a '0') in a specific register in the PLC. . . . [T]his status bit only indicates whether the recipe has been loaded into the PLC and does not indicate in anyway [sic] the status of the equipment associated with the PLC.

(Kehres Decl. ¶ 13; ArvinMeritor's SF ¶ 32.) Solaia argues to the contrary, offering the

following deposition testimony of expert Kevin Welch:

> Q    I'll ask it this way: The Rabofsky system has a plurality of programmable logic
>      controllers coupled to the equipment, said programmable logic controllers each
>      transmitting messages on a network indicating the condition of said equipment,
>      true?
>
> A    Yes.
>
> Q    Okay.  And so does the Flex system, correct?
>
> A    Yes.
>
> A    And also the PST system, correct?
>
> Q    Yes.

(Solaia's Resp. ¶ 32; Solaia's Ex. 2 (Welch Dep.) at 145:21 - 146:11.)  As discussed above, an

expert's opinion as to the ultimate question of infringement is insufficient to defeat summary

judgment where it lacks an adequate factual foundation for the court to determine whether that

factual foundation would support a finding of infringement.  *See Arthur A.*, 216 F.3d at 147-48.

Unlike the Kehres testimony, which offers facts about the workings of the systems, the Welch

testimony offers a conclusion (with no factual foundation) as to whether a particular element of

the patent is present in the systems.  This is insufficient to create a triable issue of fact.  *See, e.g.,*

*Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) (affirming summary judgment

based on district court's determination that expert opinion lacking factual founding did not create

genuine issue of material fact as to equivalence).

Solaia also offers an opinion by Nuschke that the PLC sending the status bit to the VB

constitutes is the same as indicating the condition of equipment.  (*See* Nuschke Decl. ¶¶ 24-27.)

Nuschke points to testimony by Kehres that the VB program is "polling" the register in the PLC to determine whether a "1" status bit is in the register, as well as Kehres's agreement that in this "polling," a message is "sent back to the VB application indicating the condition *of that register*." (*Id.* ¶ 26 (quoting Solaia's Ex. 5 (Kehres Dep. of 5/12/2004) at 124:13-23) (emphasis added).) Nuschke apparently uses this testimony as the factual basis for his opinion that "[p]olling simply means that a request is sent from the software on the PC that a message be sent from the PLC advising the PC of the status or condition *of the equipment*." (*Id.* ¶ 26 (emphasis added).) But as the italicized language shows, Kehres's testimony shows only that the VB program may indicate the status or condition of the PLC register; there is no evidence that the status bit indicates the state of repair or ability to function of the equipment coupled to that PLC. The distinction in the claim limitations is unambiguous: the messages shall indicate the condition of the "said equipment," which is the equipment to which the PLCs are coupled, not the condition of the PLCs themselves. (*See* '318 patent, col. 16, lines 46-47.)

Thus, the factual foundation on which Nuschke rests his opinion is not sufficient for a reasonable trier of fact to conclude that ArvinMeritor's Flex/PST systems send messages indicating the condition of the equipment. In the absence of other record evidence, the Court finds that Solaia has not created a triable issue of fact as to whether claim 11's limitations of sending messages that indicate the condition of the equipment are present in the Flex/PST systems. Thus, summary judgment is proper as to claim 11 for those systems.

3.    Inserting Address of a Particular Register

As an independent ground for decision, the Court also finds that summary judgment is proper for the Flex/PST and Rabofsky systems as to claim 12 because Solaia has not produced

evidence that creates a material issue of fact as to whether the systems perform the function of the "add-in program means," namely "inserting into at least one cell information including the address of a particular register."

The *Jefferson Smurfit* court did not construe this claim limitation. The parties do not dispute that this claim limitation is construed pursuant to section 112, ¶ 6, and because it uses the typical "means for" terminology without reciting structure in the claim, the Court will construe it as such. "The first step in construing a means-plus-function limitation is to identify the function explicitly recited in the claim." *Asyst Technologies, Inc. v. Empak*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). The parties do not dispute that the function is "inserting in at least one cell information including the address of a particular register in a particular programmable logic controller to which a message is to be sent and including the content of said message." ('318 patent, col. 17, ll, 37-39.) "The next step is to identify the corresponding structure set forth in the written description that performs the particular function set forth in the claim." *Asyst*, 268 F.3d at 1369. The parties disagree over the structure disclosed in the patent.

ArvinMeritor argues that the corresponding structure is the software instructions implementing the @ functions, "@ WRITE" and "@ BWRITE," as shown in Figure 7 of the patent. (*See* '318 patent, col. 11, lines 32-45). Solaia argues that the corresponding structure is that identified in the *Jefferson Smurfit* case for a separate function of the "add-in program means," the "add-in program" disclosed in Figure 2, item 28 of the patent. (*Jefferson Smurfit* Order, ¶ 10.) The Court need not resolve this dispute because the Court finds that Solaia has failed to adduce evidence that creates a triable issue of fact as to whether there is an identity of function between the "add-in program" means of claim 12 and the ArvinMeritor systems. *See*

*Odetics*, 185 F.3d at 1267 ("[f]unctional identity and either structural identify or equivalence are *both* necessary" for infringement of a section 112, ¶ 6 claim limitation (emphasis in original)) (citing *Pennwalt*, 833 F.2d at 934).

ArvinMeritor argues that summary judgment is proper because its systems do not allow a user to input the address of a PLC register into the cells of the display program. (The Court, again, assumes for purposes of this discussion that the text boxes of the VB and Simatic Pro Tool programs are spreadsheet "cells" as recited in the function.) Solaia argues in its response brief that the Flex/PST systems do perform this function, pointing to an assertion by Nuschke based on testimony regarding how "tags" are used in the system, and also pointing to operating instructions for the Rabofsky system. (*See* Solaia's Resp. Br. at 42 (citing Nuschke Decl. ¶ 107); *id.* at 48.)

In the Flex/PST systems, according to testimony from Steven Zink (who appears to be an employee of Rockwell), a particular address of a PLC register is given a common name, called a "tag" in the industry. (Solaia's SAF ¶ 145 (citing Solaia's Ex. 3 (Zink Dep.) at 77:6-12).) Jeffery Kehres testified as follows:

> Q     How does the tag know which particular register in a particular PLC it's supposed to go to?
>
> A     The [] values inside Visual Basic are put into a string to be sent to RSLinx. RSLinx knows that there's a certain number of values in this string and, in turn, will give it a [] register address in which RSLinx will handle it. And that's all done through the RSLinx in the poke command, the Visual Basic script."

(*Id.* (quoting Solaia's Ex. 5 (Kehres Dep. of 5/12/2004) at 131:17-23).) These two snippets of testimony underlying Nuschke's opinion are the only factual foundation offered by Solaia to support its argument that the ArvinMeritor systems perform the function of "inserting in at least

49

one cell information including the address of a particular register." This testimony demonstrates to the Court nothing more than precisely what it says: values from the VB program are identified with PLC addresses as they are sent through RS Linx. Solaia has presented the Court with no evidence that either a human user or the system itself ever enters the tag into a cell. This is an insufficient factual basis from which a reasonable jury could conclude that this behind-the-scenes addressing is actually a function of inserting the PLC address into at least one spreadsheet cell.

Solaia also submits in its response to ArvinMeritor's statement of facts a discussion related to the insertion of addresses into cells. (*See* Solaia's Resp. ¶ 38.) The Court is compelled to discuss a serious procedural infraction Solaia commits that is germane. Often times in the briefing, the parties commit violations of Local Rule 56.1 by citing directly to record materials instead of the L.R. 56.1 statements of material fact, as they should. Generally speaking, the Court has excused these violations. However, the Court cannot excuse Solaia's attempt to respond to one of ArvinMeritor's statements of fact with an approximately *seven-page* extended exegesis that is either an improper attempt to set forth additional factual assertions in contravention of L.R. 56.1,[26] or, perhaps additionally, an improper attempt to file seven

---

[26] Local Rule 56.1 calls for a "concise response to the movant's statement." L.R. 56.1(b)(3). Additional facts are properly set out in the non-movant's statement of additional facts. *See* L.R. 56.1(b)(3)(B); *Kaplan v. City of Chicago*, 2004 WL 2496462, at * 2 (N.D. Ill. Nov. 4, 2004) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)) (striking additional facts submitted in responses); *Parsons Tanning Co. ex rel. Weinstein v. Schwartz*, 2004 WL 1593909, at *1 (N.D. Ill. July 15, 2004) (same); *accord, e.g., Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (collecting cases and stating, "'[W]e have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.'") (quoting *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir.2002)).

additional pages of argument in violations of page limits for the briefs.[27] The Court will not

excuse this egregious violation, and the seven pages of either improper new factual assertions, or

improper briefing, or both, are stricken. *Accord S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d

878, 882 (N.D. Ill. 1998) (under prior version of local rule, refusing to consider 2-page response

to statement of fact which contained legal argument).

Even if the Court were inclined to consider the arguments presented in this procedurally

improper fashion (which it is not), those arguments do not create an issue of fact. Over several

pages of discussion, Solaia strings together testimony presented by several other witnesses to

conclude that "the Flex and PST Systems displays have cells (which are synonymous with tags),

and that those cells contain the address of a particular PLC register to which a message is sent

---

[27]  "The purpose of the 56.1 statement is to identify for the Court the evidence
supporting a party's factual assertions in an organized manner: it is not intended as a forum for
factual or legal argument." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). The Court
notes that the difference between argument offered in a brief and a response to a statement of fact
is not trivial. First, a summary judgment movant is entitled to reply to arguments made in the
non-movant's response brief; it is not entitled to reply to the non-movant's response to its
statement of facts. *See Schulz v. Varian Med. Sys., Inc.*, 315 F. Supp. 2d 923, 925 n. 1
(N.D.Ill.2004); *accord Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1000 n. 2 (N.D. Ill.2002) (citing
*White v. Sundstrand Corp.*, No. 98 C 50070, 2000 WL 713739, at *2 (N.D. Ill. May 23, 2000),
*aff'd*, 256 F.3d 580 (7th Cir.2001)). If the Court were to allow Solaia to present this kind of
argument to the Court in its response to a statement of fact, ArvinMeritor would unfairly need to
give up some of its allotted pages responding to these additional arguments. Second, allowing
such a practice as Solaia has attempted here would eviscerate pages limits set forth by the Court
for briefing. Both parties were granted substantial extensions to the pages limits presumptively
established by local rule. *See* L.R. 7.1 (limiting briefs to 15 pages absent prior approval of the
court). Solaia, for example, was allowed to file a 49-page response brief. Solaia effectively
flouted even this extension in its response, as it six times placed drawings and charts on the
backs of other pages of its response brief (*i.e.* submitted double-sided brief pages). The Court
has excused this improper practice, which the Court has never seen another litigant even attempt.
The Court will not, however, allow Solaia to commit the doubly-flawed stop of inserting new
additional briefing and new factual assertions into the case through its response to
ArvinMeritor's statement of facts (as opposed to Solaia's own statement of facts and response
brief to which ArvinMeritor gets an appropriate opportunity to fairly respond).

because those cells (i.e., tags) reference the particular PLC register," citing to Nuschke's declaration for support.[28] (Solaia's Resp. ¶ 38 (at 29) (citing Nuschke Decl. ¶ 113).) Solaia also offers the conclusion that testimony offered by Kehres "establishes that in the Flex and PST Systems[,] a string containing the address of a particular register in a particular PLC is associated with each tag (i.e., cell)." (Solaia's Resp. ¶ 38 (at 30) (citing Nuschke Decl. ¶ 116).) Pointing to further testimony, Solaia states the Flex/PST systems "associate a particular PLC with a topic name through a string" and RSLinx "connects the topic name to the particular PLC and the string address to the particular register in that PLC," ultimately concluding that "[t]he operator entering a machine name on the screen is the identical function" as that in claim 12. (Solaia's Resp. ¶ 38 (at 31) (citing Nuschke Decl. ¶ 117).)

Nowhere in this discussion, however, does Solaia provide an explanation as to why a program in which cells "*reference* the particular PLC register" (Nuschke Decl. ¶ 113 (emphasis added)), or in which "a particular PLC is *associated with* [a cell]" (*id.* ¶ 116 (emphasis added)), performs the identical function of a program that "insert[s] in at least one cell information including the address of a particular register" ('318 patent, col. 17, lines 45-46). None of Solaia's evidence indicates that the address is ever actually inserted into the cells of the VB program. The function of the "add-in program means" is not some broader function of coordinating the data with the address of a PLC register. Rather, it is the specific function of "inserting in at least one cell . . . the address." (*Id.*) And Solaia has failed to provide evidence

---

[28] The fact that Nuschke offers this opinion does not help Solaia. When determining whether an expert's opinion is sufficient to create an issue of fact, the Court determines whether the factual foundation provided by the expert for his opinion would support a finding of infringement. *See Arthur A. Collins*, 216 F.3d at 1047-48.

that would enable a reasonable jury to conclude that the ArvinMeritor systems perform that function. Thus, for the independent reason that Solaia has failed to produce evidence on the record presented that the Flex/PST systems perform the function of the "add-in program means," summary judgment is proper as to those systems for claim 12 of the '318 patent.

Regarding the Rabofsky system, Solaia has failed to adduce evidence that creates a triable issue of fact as to whether that system performs the function of inserting addresses into at least one cell. Solaia offers the following from the *Rabofsky Operating Instructions*: "In addition, there are two other keys that enable sending a data record to the control (Send) and another one for retrieving (Get) a data record from the control." (Solaia's Ex. 30 at AM0011086.) Solaia offers Nuschke's conclusion that "[t]his shows that addresses must be inserted." (Solaia's Resp. ¶ 158 (citing Nuschke Decl. ¶ 122).) Nuschke offers essentially the same rationale for why the Rabofsky system performs the function as he did for the Flex/PST systems, that "tags must be specified in the configuration which point to an address in a PLC." (Nuschke Decl. ¶ 122.) As discussed above, however, a tag which "points" to an address in a PLC does not demonstrate that the program inserts an address of a PLC register into a cell. Thus, Solaia has failed to create a triable issue of fact as to whether the Rabofsky system, too, performs the function "inserting in at least one cell information including the address of a particular register."

## CONCLUSION

Solaia has failed to create an issue of material fact as to whether the Flex/PST and Rabofsky systems infringe claims 11 and 12 of the '318 patent. First, there is no issue of fact as to whether all three systems perform the function "effecting a general purpose spreadsheet" of claim 11 because (1) none of the programs effect a "spreadsheet, and independently, (2) even if

53

the programs did effect a spreadsheet, none of the programs effect a "general purpose" spreadsheet. The systems to not perform this function, and therefore, ArvinMeritor is entitled to judgment as a matter of law on claim 11 of the '318 patent. Second, there is no issue of fact as to whether all three systems employ the corresponding structure or its equivalent disclosed in claim 12, "a general purpose spreadsheet." The systems do not employ a general purpose spreadsheet program or its equivalent, and therefore, ArvinMeritor is entitled to judgment as a matter of law on claim 12 of the '318 patent. Third, there is no issue of fact as to whether the Flex/Rabofsky systems have messages "indicating the condition of said equipment" as recited in claim 11. These systems do not indicate the condition of the PLCs, and therefore, ArvinMeritor is entitled to judgment as a matter of law on claim 11 of the '318 patent as to the Flex/Rabofsky systems on this alternate and independent ground. Fourth, there is no issue of fact as to whether all three systems perform the function "inserting in at least one cell information including the address of a particular register." The systems do not perform this function, and therefore, ArvinMeritor is entitled to judgment as a matter of law on claim 12 of the '318 patent on this alternate and independent ground. The Court need not reach the other arguments made by ArvinMeritor as to why summary judgment is proper, including the arguments regarding surrender. ArvinMeritor's motion for summary judgment of non-infringement (D.E. 569) is granted.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: March 28, 2005