IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Solaia Technology LLC, | ) |
| | ) |
| Plaintiff, | ) No. 02 C 4704 |
| | ) |
| v. | ) Judge Mark Filip |
| | ) |
| ArvinMeritor, Inc., | ) Magistrate Judge Nan Nolan |
| | ) |
| Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| Rockwell Automation Inc., | ) |
| | ) |
| Third-Party Defendant-<br>Cross-Claim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Solaia Technology LLC, | ) |
| | ) |
| Cross-Claim Defendant-<br>Counterclaim-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Rockwell Automation Inc., | ) |
| | ) |
| Counterclaim-Defendant. | ) |

**MEMORANDUM OPINION AND ORDER DENYING MOTION OF
SOLAIA TECHNOLOGY LLC TO ENFORCE
PURPORTED ORAL SETTLEMENT AGREEMENT**

Plaintiff, Solaia Technology LLC ("Solaia"), has moved for this Court to enforce an oral

settlement agreement that it alleges it entered into with Third-Party Defendant, Rockwell

Automation Inc. ("Rockwell"). (D.E. 710 (Motion), 748 (Revised Mem. of Law).) Specifically, Solaia asks this Court to enforce an oral settlement agreement it alleges the parties entered into before March 30, 2005. Rockwell responds with three arguments as to why Solaia's motion should be denied: (1) the parties intended to be bound only upon the execution of a signed, formal document, which execution was a condition precedent to settlement; (2) Solaia has failed to establish offer, acceptance, and a meeting of the minds; and (3) the statute of frauds bars enforcement of any purported oral agreement. The Court has carefully considered the evidence presented by the parties (which included testimony and documents presented in a two-day hearing conducted on the motion), the briefs, and the oral arguments. For the reasons stated below, the motion to enforce the purported oral settlement agreement is respectfully denied.[1]

## FINDINGS OF FACT[2]

This case has a lengthy procedural history, with over seven hundred docket entries in the instant case alone. (There is related litigation elsewhere, as well.) The Court assumes the parties' familiarity with the course of litigation on the substantive issues and does not attempt to summarize the general history of the case here.

Of relevance for present purposes, between September 2004 and March 2005, Rockwell and Solaia engaged in extended settlement discussions. On November 24, 2004, John Miller

---

[1] Much of the evidence was essentially undisputed. To the extent there were any material factual disputes in the evidence, the Court resolves credibility determinations and conflicts in support of this ruling.

[2] To the extent that certain findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law. *Accord, e.g., Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D.Ill. May 18, 2000). Similarly, to the extent the matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact. *Accord, e.g., id.*

2

("Miller"), Rockwell's Vice President and Chief Intellectual Property Counsel (Hr'g Tr. at 9), sent to Daniel Henderson ("Henderson") of Solaia a letter indicating Rockwell's "essential settlement components." (Pl. Ex. 1.) Mr. Henderson responded to Mr. Miller (Pl. Ex. 2), and on January 31, 2005, Raymond Niro ("Niro"), of the law firm Niro, Scavone, Haller & Niro ("Niro Scavone") representing Solaia, tendered a proposed form of a settlement agreement to Douglas Hagerman ("Hagerman"), Rockwell's Senior Vice President and General Counsel. (Pl. Ex. 3.) This proposed agreement served as the template for future drafts exchanged between the parties.

The proposed agreement involved parties other than Rockwell and Solaia. The February 24, 2005 draft of the agreement contemplated the following parties: Solaia; Niro Scavone; Rockwell; James O'Shaughnessey (a former officer of Rockwell); Arvinmeritor, Inc. ("ArvinMeritor"); and the law firm Howrey, Simon, Arnold & White ("Howrey"). (*See* Pl. Ex. 4.) From the outset, the negotiations excluded Schneider Automation ("Schneider") from the scope of any settlement agreement. (Pl. Ex. 1 ("A settlement with Schneider is not within the scope of this proposal."); Pl. Ex. 4 ("We have expressly carved out 'Schneider Entities' from the scope of the agreement."); Hr'g Tr. at 9, 87.) The negotiations for settlement encompassed several lawsuits involving Solaia and Rockwell, as well as other parties, in both Chicago and Milwaukee. (Hr'g Tr. at 197-98.)

The parties agreed—apparently at the behest of Rockwell—to approach the settlement negotiations in a two-tiered fashion: first, the parties would seek agreement on non-monetary terms, and then the parties would discuss any monetary payment. (Hr'g Tr. at 9-10, 13, 101, 200.) Drafts of the proposed agreement were sent back and forth between Rockwell and Solaia with blanks in place of the monetary terms and the date by which any money would be paid.

3

(*E.g.*, Pl. Ex. 3 ¶ 4; Pl. Ex. 11 ¶ 4.) The non-monetary terms of the proposed agreement included, *inter alia*, releases of claims (Pl. Ex. 9 ¶¶ 5, 6); covenants not to sue (*id.* ¶¶ 7, 8); confidentiality provisions (*id.* ¶ 13); an agreement on choice of law (*id.* ¶ 17); and a provision concerning the involvement of Rockwell in a suit pending between Solaia and a company called Specialty Publishing. (Pl. Ex. 14 ¶ 4.) Each unsigned draft of the proposed agreement included the following two paragraphs:

15.  This Agreement is intended as a complete and exclusive statement of the arrangements between the Parties with respect to the matters contemplated in the Agreement, and cannot be changed or terminated orally, and merges all prior understandings, representations and undertakings between the Parties. No amendment to this Agreement shall be given effect unless it is in writing and duly executed with the same formally [sic] as this agreement.

16.  This Agreement will become binding and effective upon the exchange of facsimile or other electronic copies of the required signatures. The Parties will thereafter exchange formal signed originals of this Agreement for their permanent records.

(*See, e.g.*, Pl. Ex. 23 ("March 29 Draft" ¶¶ 15[3] ("Paragraph 15"), 16 ("Paragraph 16").)[4]

On March 17, 2005, the parties discussed the settlement amount during a telephone conference. (Hr'g Tr. at 105.) The persons on that telephone call were Messrs. Hagerman and Miller for Rockwell and Messrs. Niro and Paul Vickrey ("Vickrey") for Solaia. (*Id.*) During that

---

[3] Only two substantive changes were made to these paragraphs from the original draft. First, the last sentence in Paragraph 15 was added. Second, "or other electronic" was added between "facsimile" and "copies" in Paragraph 16. (Pl. Ex. 3 ¶¶ 15, 16.)

[4] As recounted below, Solaia emailed a revised draft agreement to Rockwell at 5:22 p.m. on March 29. (*See* Pl. Ex. 25.) However, Solaia argues that the March 29, 3:16 p.m. draft (Pl. Ex. 23) "embodie[s]" the material terms of settlement, and Solaia cites throughout its briefs to the 3:16 p.m. version of the settlement agreement. (*See* D.E. 748 at 7-8.) Therefore, the Court also refers to the 3:16 p.m. draft when necessary to address material terms, and refers to it in this opinion as the "March 29 Draft."

4

conversation, the parties discussed a particular amount of money as the putative payment provision. (*Id.* at 108.[5]) That amount was included in the next draft circulated by Mr. Niro to Messrs. Hagerman and Miller on March 17, 2005. (Pl. Ex. 14 ¶ 4.) Mr. Hagerman did not have Rockwell's approval to settle for that amount at that time. (Hr'g Tr. at 110; Pl. Ex. 15 (email from Mr. Miller to Mr. Niro, March 21, 2005) ("I did not change the [ ] number although Doug [Hagerman] still does not have approval for that number.") Also during the March 17 conference call, Mr. Hagerman discussed hiring Niro Scavone to represent Rockwell in the future. (Hr'g Tr. at 107.) At that time, Mr. Niro identified two problems with negotiating concerning any such representation. First, Mr. Niro expressed concern about a potential conflict of interest given that Niro Scavone was then representing Solaia in proceedings adverse to Rockwell. (*Id.*) Second, Mr. Niro expressed concern that Rockwell was considering retaining Niro Scavone merely to conflict the firm from representing other clients against Rockwell in the future. (*Id.* at 107-08.)

On March 23, 2005, Mr. Niro had a phone conversation with Messrs. Miller and John Briggs ("Briggs") of Howrey, in which Mr. Miller informed Mr. Niro that the CEO of Rockwell had approved the amount of money being discussed "but not a penny more."[6] (Hr'g Tr. at 111-

---

[5] Due to confidentiality concerns, the Court permitted the parties to refer to the dollar amount as "X" throughout the proceedings. (Hr'g Tr. at 7.) The parties submitted this amount to the Court so it is available to the appellate court on review. *See generally Union Oil Co. of California v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000) (teaching about the need for court proceedings to proceed in public and not under seal as much as possible, but endorsing the practice of issuing opinions that do not disclose information that is appropriately maintained confidential, such as the trade secrets of a party that are the subject of a trade secret dispute).

[6] Between March 17 and March 23, the parties discussed a liquidated damages provision related to any potential liability if Rockwell could not get a release from Schneider for payments Solaia would have to make under its contract(s) with Schneider, but that provision was ultimately dropped altogether. (Hr'g Tr. at 110-11, 112-13; Pl. Ex. 17 (voicemail message from Mr. Niro to Mr. Miller, March 23, 2005).)

12.) At 5:29 p.m. on March 23, Mr. Niro left Mr. Miller a voicemail message that stated, in

pertinent part, that "we're ready to plunge." (Pl. Ex. 17.) At that time, Mr. Niro did not have the

approval of Mr. Henderson at Solaia, but Mr. Niro stated that he would "take it to him and highly

recommend that he accept the deal as I've now written it." (*Id.*) At 5:47 p.m. on March 28, Mr.

Niro sent to Mr. Miller a draft of the proposed agreement that he described as being "in the form

we propose recommending to our client." (Pl. Ex. 19.) Solaia had approved the settlement as it

was represented in the March 28 draft. (Hr'g Tr. at 115.) At 7:27 p.m that same day, Mr. Niro

sent Mr. Miller an email discussing Rockwell's proposal to retain Niro Scavone. (Pl. Ex. 20.)

The email began by stating, "After the Solaia-Rockwell lawsuits are settled, we would consider

representing Rockwell in intellectual property matters." (Pl. Ex. 20; Hr'g Tr. 151-52.) The

email included some proposed terms that any representation would require, but ultimately stated

that "we cannot accept any representation or even agree to terms of representation until the

lawsuits are concluded and there is no longer an adversarial relationship between Rockwell and

any of our clients." (*Id.*; Hr'g Tr. 115-16.) The email concluded, "We will also have to clear

this with Dan Henderson [of Solaia] but I suspect that will not be [a] problem if a settlement is

reached." (Pl. Ex. 20.)

The next day, March 29, 2005, at 11:25 a.m., Mr. Niro called Mr. Miller and left a

message suggesting that the parties should "contact the judge today if we have a meeting of the

minds on the basic terms of settlement letting him know that we may need a couple more days

just to get everything finalized but no need to resolve any of the pending issues, and [] he can

stop working on that." (Pl. Ex. 21; Hr'g Tr. 118.) Mr. Niro also said that he was "afraid [the

judge is] going to decide this thing" (*i.e.*, issue an opinion concerning one or more of the motions

6

the parties had filed), and he asked Mr. Miller "to get back to me and let me know if we are going to do this thing or not." (*Id.*) Just before noon that day, Mr. Miller returned Mr. Niro's phone call and left the following message:

> Ray, John Miller calling your cell phone as requested. Listen, I don't have a problem with [] you or someone from your office, and [] someone from Howrey calling the judge and telling him that we're [] close to a deal being done and you know hold off on any decision, we think we're gonna get you something next week. I believe Ray that we're [] close. We're [flyspecking] the document today and I don't see a [] single word that needs to be changed, although we're taking a once-over careful look at it. I [] think we're there. I'm still waiting on [] my other issue which [] I've been told I'm gonna get [a] call back today on. . . . And so that's [] what's holding me up. But I'm fine in the meantime to tell the judge, as you said, you know, we need a couple of days here because we might—well, you know, have this thing wrapped up soon. So if that's what you were implying in your message, just go right ahead, call Briggs . . . or someone on his team and just do it. Okay? Thanks. Bye.

(Pl. Ex. 22; Hr'g Tr. at 71.) Also that same day, Mr. Miller sent Mr. Niro an email which stated, in pertinent part, "As I see it there are two issues that are between us and done." (Pl. Ex. 24.) The two issues were (1) a retainer agreement with Niro Scavone, and (2) negotiations on "a separate agreement related to this matter" that Miller stated he could not discuss. (*Id.*) At 3:16 p.m., Mr. Miller sent Mr. Niro a draft agreement with redline changes and one substantive change. (March 29 Draft.) At 5:22 p.m., Mr. Niro sent Mr. Miller a draft of the proposed settlement agreement that approved changes made earlier that day by Mr. Miller and made two other changes. (Pl. Ex. 25.) That was the last draft exchanged between the parties.

As of March 29, 2005, Rockwell had not obtained the authority from ArvinMeritor to settle all the lawsuits included in the scope of the draft agreements. (Hr'g Tr. at 204, 213.) Nor had Briggs secured authority from Howrey to release any claims it may have had against Solaia and/or Niro Scavone pursuant to the terms embodied in the March 29 draft. (*Id.* at 212-13.)

On March 29, 2005, Briggs and Niro called this Court. (Hr'g Tr. at 205-06.)[7]
Unbeknownst to the callers, the Court had issued two opinions in the case (D.E. 697-700) the
previous day concerning various issues and summary judgment motions.

## CONCLUSIONS OF LAW

"Local contract law governs the construction and enforcement of settlement agreements."
*Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999) (citing *Laserage
Tech. Corp. v. Capco, Inc.*, 972 F.2d 799, 802 (7th Cir. 1992)). The parties agree that Illinois
law governs this dispute. (*See* D.E. 748 at 10; D.E. 753 at 3 n.3.)[8]

I.      Execution of a Written, Signed Agreement Was a Condition Precedent to Settlement.

Under Illinois law, "'[a]n oral agreement to settle will be enforced as long as there is
clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of
the agreement.'" *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995) (quoting *Brewer v. Nat'l
R.R. Corp.*, 628 N.E.2d 331, 335 (Ill. App. Ct. 1993), *rev'd on other grounds*, 649 N.E.2d 1331,
1334 (Ill. 1995)) (alteration in original). Whether parties had a "meeting of the minds"—a term
the Seventh Circuit has described as an "often-deceptive . . . metaphor," *Laserage Tech. Corp.*,
972 F.2d at 802—is "determined by reference to what the parties expressed to each other in their
writings, not by their actual mental processes." *Id.* This is what is known as the "objective
theory of intent." *Id.*

---

[7] The substance of the phone call is not in evidence before the Court by agreement of the
parties (*see* Hr'g Tr. at 206-07) and forms no part of the Court's analysis.

[8] The Seventh Circuit teaches that where "the parties do not make an issue of choice of
law, [a court has] no obligation to make an independent determination of what rule would apply
if they had made an issue of the matter." *In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir. 1993).

If the parties have made the execution of a formal written agreement a condition precedent to the formation of a contract, there can be no contract, even if all material terms have been agreed upon. *See, e.g., Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978); *Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 5 (Ill. 1986); *Robin v. Robin*, No. 02 C 8181, 2004 WL 1381131, at *3 (N.D. Ill. May 7, 2004) ("'[W]here the reduction of an agreement to writing and its formal execution is objectively intended by the parties as a condition precedent to its completion, there can be no contract until then, even if the actual terms have been agreed upon.'" (quoting *Trendmasters, Inc. v. Walgreen Co.*, No. 95 C 5379, 1996 WL 422273, at *2 (N.D. Ill. July 24, 1996)). The Seventh Circuit has explained that, under Illinois law,

> [e]ven if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed. On the other hand, if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed.

*Lambert*, 575 F.2d at 135; *see also Chicago Investment Corp. v. Dolins*, 481 N.E.2d 712, 715 (Ill. 1985) ("If the parties construe the execution of a formal agreement as a condition precedent, then no contract arises unless and until that formal agreement is executed."). "A condition precedent is one which must be performed before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform." *McKee v. First Nat'l Bank of Brighton*, 581 N.E.2d 340, 345 (Ill. App. Ct. 1991) (citation omitted). As the party contending that a condition precedent exists, Rockwell bears the burden of proving that the parties intended such a condition at the time of the contract. *See Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1239 (Ill. App. Ct. 1995).

Based on the objective evidence before the Court, the Court finds that there could be no

9

binding settlement between the parties because the execution of a formal written agreement was a condition precedent to any settlement contract between the parties.

Solaia does not argue that any of the drafts are themselves enforceable; rather, it argues that the March 29 Draft "embodied" the material terms of settlement. (D.E. 748 at 7; *see also id.* at 10 ("Among the terms to which the parties agreed orally, and which were then *memorialized* in the March 29 writing, was [choice of law].") (emphasis added); *id.* at 14 ("Rockwell's March 29 'Agreement' serves exactly the same purpose—recording all the material terms of settlement—as statements made before a court reporter . . . .").) Thus, the Court looks first to the language of the March 29 Draft to discern the intent of the parties.

The intent of the parties regarding a condition precedent is a question of law where the relevant language at issue is unambiguous. *See, e.g., Catholic Charities v. Thorpe,* 741 N.E.2d 651, 653 (Ill. App. Ct. 2000). Language that is unambiguous is language susceptible to only one reasonable interpretation. *See Moriarty v. Svec,* 164 F.3d 323, 330 (7th Cir. 1998). In contrast, ambiguous language is susceptible to more than one meaning or is otherwise obscure. *See Meyer,* 652 N.E.2d at 1238. Conditions precedent may be indicated by terms such as "'on the condition,' 'subject to,' 'when,' 'as soon as,' or other similar terms." *AAR Int'l, Inc. v. Vacances Heliades, S.A.,* 202 F. Supp. 2d 788, 800 (N.D. Ill. 2002) (citing *Chicago Graphic Arts Health & Welfare Fund v. Jefferson Smurfit Corp.,* No. 94 C 1957, 1995 WL 579538, at *7 (N.D. Ill. Sept. 28, 1995)).

A.   The Language of The March 29 Draft Unambiguously Evidences an Intent To Be Bound Only Upon The Execution of a Signed Agreement.

Paragraph 16 of the drafts—in language which did not change substantially from the

original through the final draft—states, "This Agreement will become binding and effective *upon the exchange* of facsimile or other electronic copies of the required signatures. The Parties will thereafter exchange formal signed originals of this Agreement for their permanent records." (Pl. Ex. 23 ¶ 16 (emphasis added).) Additionally, the very first sentence of the draft agreement states, "This Settlement and Release Agreement ('Agreement'), effective and binding upon the exchange of facsimile or other electronic copies of the required signatures . . . ." (*Id.* at 1, intro. para.) This language is unambiguous and clearly indicates that the parties did not intend to be bound by any settlement agreement until signatures had been exchanged. The phrase "upon the exchange of" can only fairly be read to indicate the time at which the parties intended an agreement to be binding, and that time is when signatures have been exchanged. In other words, the parties envisioned that the settlement agreement would become binding only *after* the signatures would be exchanged, thus making such signatures a condition precedent to a contract. *Accord Cont'l Cas. Co. v. Steelcase Inc.*, No. 02 C 8064, 2004 WL 1965699, at *8 (N.D. Ill. Aug. 23, 2004) (finding provision "to be paid upon execution of . . . the agreement" to unambiguously signal the parties' intent to create a condition precedent).

In *IK Corp. v. One Fin. Place P'ship*, 558 N.E.2d 161, 167 (Ill. App. Ct. 1990), an Illinois appellate court affirmed a trial court's determination that language similar to Paragraph 16 in a lease draft was unambiguous and evidenced an intent not to be bound until execution of a written document. The language in that clause provided that "the Instrument does not become effective as a lease or otherwise until executed and delivered by both Landlord and Tenant." *Id.* According to the court, "[i]f the draft leases tended to evidence a binding contract, they would not customarily contain an express disclaimer stating that the parties do not intend to be bound

11

until a more formal document is completed and executed. Since the draft leases have such a clause, we must conclude that the parties intended to enter non-binding preliminary negotiation." *Id.*

Solaia argues that the provision in Paragraph 16 refers only to the written agreement that the parties contemplated would become effective after signing. (Hr'g Tr. at 127-28.) According to Solaia, *if* the parties reduced their oral agreement to writing, *that* agreement—actually "[t]his" agreement, to use the language of Paragraph 16—had to be signed to become effective. Thus, goes the theory, nothing in Paragraph 16 precludes the parties from entering an earlier, binding oral agreement of settlement, the terms of which are reflected in and embodied in the unsigned written draft. With all respect, this reading of Paragraph 16 is unpersuasive. Solaia offers no evidence or legal authority to support its position that this is a reasonable interpretation of this standard provision. The Court finds that Paragraph 16 unambiguously evidences a condition precedent to settlement. Because the signatures were never exchanged by the parties, the condition precedent to settlement was never fulfilled. Accordingly, the motion to enforce is respectfully denied.

B.      The Objective Evidence Other Than The Language of The Agreement Proves That The Parties Intended to Be Bound Only Upon Execution of a Signed Agreement.

Even if the Court were to agree with Solaia that its interpretation of Paragraph 16 is a plausible one—which the Court respectfully does not—the most that would do is render the provision ambiguous, thus turning the determination of intent into a question of fact and allowing the Court to examine evidence beyond the language of the agreement. *See Interway, Inc. v. Alagna*, 407 N.E.2d 615, 618-19 (Ill. App. Ct. 1980). Independently, assuming that Paragraph 16

is ambiguous, the Court finds, as a matter of fact, that the objective evidence supports the conclusion that the execution of a signed agreement was a condition precedent to an actual settlement.

In *Chicago Investment Corp*, the Illinois Supreme Court offered the following factors as relevant to resolving whether the parties intended a writing to be a condition precedent to a contract:

> whether the contract is one usually put in writing; whether there are few or many details; whether the amount involved is large or small; whether it requires a formal writing for a full expression of the covenants and promises; and whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.

*Id.*, 481 N.E.2d at 714 (internal quotations omitted); *accord Quake Constr. Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990) (collecting cases). "Also, where the anticipated document is never executed, the parties' conduct and statements subsequent to the oral agreement may be decisive of the question whether a contract had been made." *Ceres*, 500 N.E.2d at 5 (citation omitted).

Solaia has pointed the Court to numerous cases where oral settlement agreements were enforced. Despite such cases, however, the Court finds that this kind of agreement is one that parties usually put in writing. *See generally Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 83 (2d Cir. 1985) (finding settlement agreement one usually reduced to writing where "the $62,500 at issue [was] not a trifling amount, [] payment was to be made over several years based on a percentage of earnings," and, while only four pages in length, "the parties evidently thought the terms and language used [in the agreement] were complex enough to require substantial redrafting."). Here, the parties include sophisticated corporations that are responsible to boards

of directors and shareholders, as well as law firms (as actual parties to the agreement) responsible to their partners. The terms of the contract, as embodied by the March 29 Draft, include warranties, releases, covenants not to sue, transfers of rights, and specific provisions as to communications about the settlement and confidentiality. (*See* Pl. Ex. 23.) It is highly unlikely that corporate litigants, law firms, and all of the sophisticated parties involved in this litigation would leave their obligations under such complex terms to the vagaries of memory.[9] Additionally, the non-frivolous payment contemplated by the parties is a strong indication that the parties intended a written agreement before being bound. *See Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1168 (S.D.N.Y 1988) ("[T]he fact that the proposed purchase price was . . . [millions of dollars] strongly supports the inference that a written agreement was contemplated."). All these factors point toward a finding that the parties intended a signed written agreement before being bound.

Next, a review of the course of negotiations between the parties demonstrates that the parties did not intend to be bound before an agreement was signed. The negotiations for

---

[9] As the Seventh Circuit has explained in a related context,

Memory plays tricks. Acting in the best of faith, people may "remember" things that never occurred but now serve their interests. Or they may remember events with a change of emphasis or nuance that makes a substantial difference to meaning. Express or implied qualifications may be lost in the folds of time. A statement such as "I won't sell at current prices" may be recalled years later as "I won't sell." Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing . . . .

*Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000) (in the securities context, a written anti-reliance clause precludes a claim of deceit by prior representations; such clauses "ensure[] that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication.").

14

settlement began with a written document, and the parties exchanged no fewer than 14 versions of the proposed agreement. (*See* Pl. Ex. 3, 4, 5, 6, 7, 8, 9, 11, 12, 14, 15, 16, 19, and 23.) Solaia admits that, throughout the entire negotiation, no one from Rockwell ever communicated to Mr. Niro or Solaia that a signed written agreement containing all the terms of the agreement would *not* be required before Rockwell would enter a binding settlement. (Hr'g Tr. at 132.) Also relevant to determining that the parties intended a written agreement is the fact that the relationship between the parties was quite adversarial. *See City & Suburban Distr. of Ill., Inc. v. Stroh Brewery Co.*, No. 87 C 1409, 1995 WL 506059, at *24 (N.D. Ill. Aug. 22, 1995) (concluding that parties did not intend to enter into a settlement agreement without a writing based in part on the fact that "by the time this litigation began, the relationship between the parties had become adversarial and the trust which existed prior to the September 1986 Letter Agreement had disintegrated."). Mr. Hagerman testified that his predecessor at Rockwell, Mr. O'Shaughnessey, "had a very intense view of this litigation and I would say a rather intense hatred for Mr. Niro and his client." (Hr'g Tr. at 176; *see also id.* at 180 ("[A written agreement] was also important to us because we needed a written agreement in light of the lack of trust that our side had for Solaia, in light of past history that I won't bore you with.").)

Additionally, the parties' conduct after the time that Solaia argues the parties were bound objectively indicates that they did not consider themselves to have a binding contract. Solaia's position is that the parties had progressively reached agreement on each and every one of the material terms of settlement, and when the financial term fell into place—on March 23—the parties had an enforceable agreement. (*See, e.g.*, D.E. 754, Ex. 12 at 23 (deposition of Mr. Niro).) But the parties' communications after that date demonstrate that they did not consider

15

themselves bound at that time. For example, Mr. Niro informed Mr. Miller that he did not yet have Solaia's approval for the settlement on March 23.[10] (Pl. Ex. 17; Hr'g Tr. at 147.) In that same communication to Mr. Miller, Mr. Niro stated that "we're ready to plunge," (Pl. Ex. 17), indicating that he had not yet considered the parties to have "plunged" into a binding settlement. In a March 28 email to Mr. Miller, Mr. Niro began by saying, "After the Solaia-Rockwell suits are settled," (Pl. Ex. 20), indicating that the parties did not consider the suits to have *already* settled. That same email stated to Mr. Miller that the Niro Scavone firm could not accept any representation of Rockwell "until the lawsuits are concluded," and that clearing any conflict with Solaia would not likely be a problem "if a settlement is reached," (*id.*), again indicating that the parties did not consider the lawsuits to have settled by March 29.[11]

Solaia points to the two-tiered approach to negotiations taken by the parties as evidence that they intended to be bound as they reached agreement on individual terms. According to Solaia, once the parties started talking money, the parties had agreement on the non-financial terms. Thus, once the financial term had been approved, the agreement was binding. But

---

[10] Mr. Niro tries to explain that while he did not have Henderson's approval for the "written deal," he did have authority to settle the case on Mr. Henderson's behalf on all the material terms. (Hr'g Tr. at 148.) But the objective evidence, that is, what Mr. Niro said to Rockwell in his email, indicates that he informed Rockwell that he needed Mr. Henderson's approval before the settlement would be binding.

[11] Solaia relies on Mr. Miller's statement in the March 29 voicemail to Mr. Niro that "I [] think we're there." (Pl. Ex. 22.) Because "there" refers to settlement, Solaia argues that this indicates that the parties had finished. With all respect, this statement points towards the opposite conclusion. Miller's use of "think" before "we're there" is most reasonably read as a qualification of the statement. Nowhere does Miller say "we're there" or, even more clearly, "we're done" or "we've got a settlement." Even if Mr. Miller's statement could be read in the way that Solaia suggests, it does not outweigh the fact that the remaining evidence (in the form of communications and statements after the financial term was "approved") indicates that the parties did not act as though they believed they had a binding deal.

16

Seventh Circuit precedent teaches that parties may choose to structure their negotiations in stages without fear of being bound. In *Empro Mfg. Co. v. Ball-Co. Mfg. Co., Inc.*, 870 F.2d 423 (7th Cir. 1989), the court held that the parties did not intend to be bound by preliminary negotiations where the objective evidence included a letter of intent that stated that the agreement was "subject to" certain conditions. *Id.* at 426. "Sometimes the details can be ironed out; sometimes they can't. Illinois . . . allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics. Approaching agreement by stages is a valuable method of doing business." *Id.*

The Seventh Circuit recently reaffirmed this understanding of Illinois law in *PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728 (7th Cir. 2005). In *Volvo Trucks*, the court held that the objective evidence showed that the parties were in the midst of negotiations and did not intend to be bound. *Id.* at 733. The court cautioned,

> [i]f any sign of agreement on any issue exposed the parties to a risk that a judge would deem the first-resolved items to be stand-alone contracts, the process of negotiation would be more cumbersome (the parties would have to hedge every sentence with cautionary legalese), and these extra negotiating expenses would raise the effective price (for in a competitive market the buyer must cover all of the seller's costs).

*Id.* at 731 (citation omitted). Thus, without more, the parties' decision to approach negotiations in stages does not evidence intent to be bound in the midst of those negotiations when pieces of a potential deal were resolved.

Additionally, Solaia argues that the phone call to the Court evidences the intent of the parties to be bound before signing an agreement.[12] Solaia points to Mr. Niro's voicemail to Mr.

---

[12] While Solaia argues that the parties were bound at the time Rockwell approved the monetary figure, it also argues (perhaps in the alternative) that, in the very least, the parties had reached a binding settlement by the time Mr. Niro and Mr. Briggs called the Court on March 29.

Miller on that day suggesting that the parties should "contact the judge today if we have a meeting of the minds on the basic terms of settlement." (Pl. Ex. 21; Hr'g Tr. at 118.) According to Solaia, the fact that Mr. Miller consented to calling the Court to inform it that a settlement was imminent demonstrates that the parties had, in fact, a meeting of the minds as of that date. There are, with all respect, two problems with this argument.

First, Mr. Miller's assent to Mr. Niro's suggestion to have the parties call the Court was premised on an expressed understanding that the parties were communicating to the Court that they "might . . . have this thing wrapped up soon." (Pl. Ex. 22.) Mr. Miller gave his permission to have Mr. Briggs call the Court "if that's what you [Mr. Niro] were implying in your message." (*Id.*) Contrary to Solaia's suggestion, this communication and the subsequent call to the Court does not prove that Rockwell considered itself (or that Rockwell indicated to others that it considered itself) to have a binding agreement at that time. Indeed, if anything, it is evidence to the contrary. Second, and independently, irrespective of whether the parties had a "meeting of the minds" as to the basic terms of settlement, that cannot constitute a binding agreement in a situation where, as here, the execution of a signed agreement was a condition precedent to a binding settlement. Even assuming Mr. Miller assented to the premise of the phone call, and even assuming he had not qualified his assent as he did, Solaia does not explain how an agreement that the parties had a meeting of the minds on the material terms is evidence that the execution of a signed agreement was not a condition precedent to settlement. One would imagine that Mr. Niro would have suggested telling the Court something less ambiguous, such as that the parties had reached a settlement agreement but were just finalizing the written version.

The Court finds that the undisputed objective evidence described above convincingly

18

proves that the parties did not intend to be bound absent the execution of a signed agreement. Because it is undisputed that the parties did not sign any agreement, the motion to enforce is denied.

Because so much time was devoted in the papers and the evidentiary hearing to the issues of settlement with Schneider and the Court's impending decision on the summary judgment motions as of the time of the March 29 phone call to the Court, the Court will address them briefly. In a nutshell, the Court finds that these issues are virtually irrelevant to the Court's inquiry. Rockwell does not argue that these were conditions precedent to settlement, instead referring to them as "gating events." (*See, e.g.*, Hr'g Tr. at 217.) And Solaia correctly argues that Rockwell's secret intent not to bind itself to a settlement with Solaia if its settlement with Schneider did not come through is not objective evidence as to its intent to be bound in a settlement with Solaia. *See generally Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir. 1987) ("Secret hopes and wishes count for nothing. The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves. It is therefore unimportant whether Walters expected this letter to be the definitive agreement; the binding force of the document depends on public or shared expressions.") (applying Wisconsin law).

Nonetheless, if parties decide to structure their negotiations such that they are not bound until the completion of a condition precedent (such as execution of a signed agreement), each party is free to walk away from the negotiations unless and until that condition is fulfilled. *See, e.g., Empro Mfg. Co., Inc.*, 870 F.2d at 425-26 (in structuring its negotiations "subject to" specific conditions, the party "made clear that it was free to walk."). All the evidence as to the

on-going negotiations with Schneider and Rockwell's intentions to settle if the Court issued any orders goes only to Rockwell's subjective state of mind as to whether it would walk away from the settlement negotiations before being bound—an action it was free to take given the Court's finding that the condition precedent to settlement was unfulfilled.

II.     The Statute of Frauds Bars Enforcement of Any Oral Settlement Agreement.

Independently, the Court finds that the purported oral agreement asserted by Solaia falls within proscriptions of the Illinois Statute of Frauds because it includes provisions that cannot be performed within one year. For the purposes of reviewing the statute of frauds argument, the Court assumes *arguendo* the existence of an oral agreement. *See Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 927-28 (7th Cir. 1991) (affirming district court's decision that, even assuming that the court had found that there was an oral agreement between the parties, the Illinois Statute of Frauds would invalidate the agreement because the contract was not performable within one year).

As discussed above, Solaia argues that the March 29 Draft "embodied" the material provisions of the oral agreement. (*See, e.g.,* D.E. 748 at 7.) Among the "material" terms highlighted by Solaia from the March 29 Draft is the condition that "Solaia agreed not to sue Rockwell, Rockwell's customers, ArvinMeritor and the OPC Foundation in the future for infringement of the Solaia patents." (*Id.* (citing, *inter alia*, March 29 Draft ¶ 7).)

This term, as "memorialized" in Paragraph 7, is the same term upon which Rockwell builds its Statute of Frauds defense: *i.e.*, "Solaia's agreement not to sue Rockwell or any of its customers for infringement of the '318 patent for the remaining life of the patent." (*See* D.E. 753 at 20 (citing March 29 Draft ¶¶ 7 ("Paragraph 7")-8).) Paragraph 7 states in relevant part:

20

7.    With the exception of any lawsuit or action to enforce this Agreement, Solaia, for itself and any of its successors, assigns and agents, covenants and agrees that it will not hereafter file, petition, or maintain against Rockwell, ArvinMeritor or the OPC Foundation, or any of their respective agents, representatives or attorneys, any lawsuit relating in any manner to the Solaia Patents. Solaia, for itself and any of its successors, assigns and agents also covenants and agrees that it will not hereafter file, petition, or maintain against any Rockwell Customer any lawsuit or action relating in any manner to the Solaia Patents based in whole or part on, or otherwise arising from, any of the acts enumerated in subparagraphs (a)-(b) below. . .

(March 29 Draft ¶ 7 (including redlined text).) Rockwell argues that this is "a promise that is not capable of performance within one year, and thus would be enforceable only as part of a written agreement." (*See* D.E. 753 at 20.) Therefore, for the Statute of Frauds analysis, the Court considers whether the promise embodied in Paragraph 7 was a promise capable of performance within one year, and whether it is the kind of promise that falls within the coverage of the Statute of Frauds.[13]

A.    The Promise in Paragraph 7 Is Not Capable of Being Performed Within One Year.

Under Illinois law,

[n]o action shall be brought . . . upon any agreement that is not be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith . . . .

---

[13] Solaia responds to Rockwell's asserting the Statute of Frauds defense by referring to a different paragraph of the March 29 Draft, namely Paragraph 5. (*See* D.E. 761 at 10 (directing the Court to Paragraph 5 of the March 29 Draft, which Solaia argues shows that "Rockwell and its agents were not granted a license, but rather an 'irrevocabl[e] release . . . .'"); *see also id.* at 12 (quoting extensively from Paragraph 5 and describing it as a "complete release of claims").) However, since Rockwell has not alleged that Paragraph 5 provides justification for the application of the statute of frauds, and since Solaia has argued that the terms embodied by Paragraph 7 are a material aspect of the purported oral agreement (*see* D.E. 748 at 7), the Court will confine its statute of frauds analysis to Paragraph 7.

740 ILCS 80/1 (2005) (the "Illinois Statute of Frauds"); *accord, e.g., McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1351 (Ill. 1997) (quoting 740 ILCS 80/1 and finding that the Illinois Statute of Frauds applied to lifetime employment contracts); *Genin, Trudeau & Co., Ltd v. Integra Development Int'l*, 845 F. Supp. 611, 616 (N.D. Ill. 1994) (concluding that noncompete agreement with eighteen month duration "could not have been performed within one year of its making," and therefore finding that the agreement fell within the Illinois Statute of Frauds unless an exception applied). Paragraph 7 does not contain an explicit time frame. However, Rockwell asserts that, since the '318 Patent remains in force until August 6, 2008, Solaia's promise not to maintain any lawsuit relating to the Solaia Patents (defined as the '318 Patent in the March 29 Draft at 5), is not to be performed within one year. (*See* D.E. 753 at 20.) Solaia does not dispute that the '318 Patent remains in force into 2008. Therefore, the Court finds that the applicable time frame for the promise not to sue in Paragraph 7 extends beyond one year.

B.    Paragraph 7 Contains a Covenant Not to Sue That Is Barred By The Statute of Frauds.

The Court next considers whether the type of promise seen in Paragraph 7 is one to which the Statute of Frauds is typically applied. First, Rockwell argues that the Statute of Frauds "applies equally to putative oral agreements to forbear from exercising one's rights to sue or bring claims against another." (D.E. 753 at 21.) The Court agrees. Nothing in the language of the Illinois Statute of Frauds provides an exception for promises not to exercise a right to sue. Moreover, Rockwell cites authority showing that oral contracts to forbear from action for more than a year are unenforceable under a statute of frauds. *See* 9 *Williston on Contracts* § 24:1 (4th ed. 2005) ("[A]n oral contract to forbear bringing suit on a certain claim for more than a year has

been held unenforceable."); *see also Genin, Trudeau & Co., Ltd*, 845 F. Supp. at 616 (eighteen month covenant not to compete "could not have been performed within one year of its making" and thus fell within Statute of Frauds); *Grondin v. Rossington*, 690 F. Supp. 200, 204-05 (S.D.N.Y. 1988) (applying Florida statute of frauds and finding that oral lifetime promise of "non-use" of a trade name was subject to the statute). Solaia cites no cases, and the Court has not found any, that suggests that promises not to sue are excepted from the coverage of the Illinois Statute of Frauds. Moreover, the authority cited above, including recent cases such as *Genin, Trudeau & Co.* and *Grondin*, refutes Solaia's unsupported assertion that the question of Solaia being prohibited from bringing suits against other customers for more than one year "is a question of breach, not one of performance of the settlement agreement." (D.E. 761 at 12.)[14]

Rockwell bolsters its Statute of Frauds defense by arguing that the promise embodied in Paragraph 7 falls under the Illinois Statute of Frauds because it is "a covenant not to sue," as opposed to a "release." (*See* D.E. 753 at 21-22.) The Court concludes that Paragraph 7 is, in

---

[14] Rockwell also analogizes the promise in Paragraph 7 to an oral license agreement for the '318 Patent, where "Solaia takes money and agrees not to exercise any claims of patent infringement against Rockwell or present and future customers of Rockwell . . . ." (D.E. 753 at 21.) Rockwell cites authority for the proposition that "oral agreements to license a patent are subject to the statute of frauds." *See Commonwealth Film Processing, Inc. v. Courtaulds U.S., Inc.*, 717 F. Supp. 1157, 1158 (W.D. Va. 1989) (finding parties' oral license agreement unenforceable under the statute of frauds). However, in contrast to *Commonwealth Film Processing, Inc.*, there is no language in Paragraph 7 or in the rest of the March 29 Draft that supports the analogy to a license agreement. Moreover, the extrinsic evidence in the present matter makes any characterization of the March 29 Draft as a license agreement a strained one. (*See* Pl. Ex. 23 at 19 (draft letter attached to March 29 Draft, intended to be sent from Rockwell to its customers, stating that Rockwell "vehemently maintains that neither our products, nor our customers' systems, infringed [the '318 Patent] . . . ."; D.E. 748, Ex. A ¶ 6(a) (declaration of Mr. Niro regarding "Rockwell's insistence, dating from the beginning of the settlement discussions, that it did not want a 'license' under the Solaia patents.").) Therefore, the Court does not rely on Rockwell's arguments citing precedent regarding treatment of oral license agreements.

23

fact, a covenant not to sue that extends for longer than one year, and as such, it is a covenant that must have been committed to writing in order to avoid being barred by the Statute of Frauds.

In this regard, Illinois precedent instructs that "[a] release is said to extinguish a cause of action, while a covenant not to sue affects only the right to bring suit and not the underlying cause of action itself." *See Brady v. Prairie Material Sales, Inc.*, 546 N.E.2d 802, 804 (Ill. App. Ct. 1989) (citation omitted); *accord, e.g., Adams Labs., Inc. v. Jacobs Eng'g Co.*, 486 F. Supp. 383, 390 (N.D. Ill. 1980) (stating same rule). Moreover, releases under Illinois law have temporal restrictions; recent Illinois case law establishes that "a contractual release cannot be construed to include claims not within the contemplation of the parties, and it will not be extended to cover claims that may arise in the future." *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89-90 (Ill. 2003) (collecting cases); *see also Capocy v. Kirtadze*, 183 F.3d 629, 632 (7th Cir. 1999) ("Illinois courts consider a release to be a contract in which 'a party relinquishes a claim to a person against whom the claim exists.'") (quoting *Carona v. Ill. Cent. Gulf R.R. Co.*, 561 N.E.2d 239, 242 (Ill. App. Ct. 1990)); 29 *Williston on Contracts* § 73:1 (4th ed. 2005) ("A release, as the word is used technically in speaking of executory contracts, is a discharge of an existing obligation or right of action."). The general limitation of releases to present or existing activity stands in contrast to the approach to covenants not to sue, which are typically treated as operating to discharge parties from liability for future acts. *See* 29 *Williston on Contracts* § 73:1; *see also* 29 *Williston on Contracts* § 73:5.

Rockwell asserts in its response brief that the characterization of Paragraph 7 as a release or a covenant not to sue is relevant for the Statute of Frauds analysis given that "[a] release does not run into any statute of frauds issue because the releasing party completes performance as a

legal act upon execution, [while] a covenant not to sue current and possibly future infringers over the remaining life of a patent, as here, is not fully performed until the time of the patent's enforceability has expired." (D.E. 753 at 22.) The Court assumes without deciding that Rockwell's interpretation of Illinois law is correct and that a release would not trigger the statute of frauds, but finds that the language of the March 29 Draft unambiguously shows that Paragraph 7 is a covenant not to sue. *See, e.g., Empro Manuf. Co., Inc.*, 870 F.2d at 425 (stating that "intent" in contract law is objective, and quoting *Schek v. Chicago Transit Authority*, 247 N.E.2d 886, 888 (Ill. 1969), for the proposition that "'intent must be determined solely from the language used when no ambiguity in its terms exist.'")).

First, the Court considers the language of Paragraph 7, which states that Solaia "covenants" that it will not bring "any lawsuit or action relating in any manner to the Solaia Patents based in whole or part on, or otherwise arising from any of the acts enumerated in subparagraphs (a)-(b) below, such that Rockwell Customers may, individually or together, without fear of suit by or liability to Solaia, (a) make, have made . . . any product . . . ." (March 29 Draft ¶ 7.) The language of Paragraph 7 strongly suggests that the term is a covenant by Solaia not to bring any suit relating to or arising from enumerated types of actions, which actions Rockwell Customers "may" take in the future.

This interpretation is supported by consideration of the preceding Paragraph 5, where the parties drafted a term to irrevocably "release and forever discharge" the named parties from "any and all claims, demands or causes of action of any nature whatsoever . . . whether asserted or unasserted, whether known or unknown, including but not limited to all claims that relate in any way to the Solaia Patents . . . ." (March 29 Draft ¶ 5.) The language of Paragraph 5 suggests a

25

release of claims existing at the time of the settlement, even those that are "unasserted" or "unknown," but it does not contain any terms or language showing an intent to release future claims. That leaves a hole in the March 29 Draft that is neatly filled by Paragraph 7. *See Young v. Allstate Ins. Co.*, 812 N.E.2d 741, 748 (Ill. App. Ct. 2004) ("Interpreting a contract requires an examination of the complete document and not an isolated part or parts.") (citation omitted).

Moreover, although the language of the March 29 Draft is not ambiguous, the extrinsic evidence supports the idea that both parties viewed Paragraph 7 as a covenant not to sue. (*See, e.g.*, D.E. 754, Ex. 12 at 39, 84 (deposition of Mr. Niro, stating that material aspects of alleged oral settlement agreement included "covenants not to sue"); *see also* D.E. 748, Supp. Dec. of Mr. Niro ¶ 6e (stating that Solaia agreed not to sue Rockwell or its customers "in the future" for infringement).)

Accordingly, the Court finds that Solaia's oral covenant not to sue for the term of the '318 Patent is covered by the Illinois Statute of Frauds. *See* 740 ILCS 80/1. The Court further finds that no exception to the application of the Statute of Frauds salvages Solaia's claim to enforce the purported oral agreement. *See McInerney*, 680 N.E.2d at 1351-52 (discussing exceptions to the Illinois Statute of Frauds). Solaia states in its reply brief that it "has never made any such contentions" that exceptions to the Statute of Frauds relating to "partial performance" and to "signed writings" should apply in the instant case. (D.E. 761 at 15.) The evidence supports Solaia's concession—given the rapid collapse of the purported oral agreement in the present matter, there would seem to be no serious claim of partial or full performance by either party. As for the "signed writing" exception, under Illinois law, any writing sought to be relied on to take an oral agreement outside of the statute of frauds "must itself show the existence

of a contract and its terms and conditions." *Storm & Assocs., Ltd. v. Cuculich*, 700 N.E.2d 202, 209 (Ill. App. Ct. 1998) (finding that writing relied on by party failed to satisfy the requirements of the statute of frauds) (citation omitted). In the present matter, the "cover letters" or emails exchanged between the parties do not show the existence of a contract, much less express its terms and conditions. Therefore, the Court finds that any purported oral agreement between the parties may not be enforced, for the independent reason that such an agreement would fail to satisfy the Illinois Statute of Frauds.

## CONCLUSION

Because the Court finds that the March 29 Draft unambiguously conditions settlement on the execution of a signed agreement, and, independently, because the Court finds as a matter of fact that the parties did not intend to be bound absent the execution of a signed agreement, the Court finds that the parties have not entered into a binding settlement agreement. In addition, the Court finds that any purported oral agreement between the parties would be unenforceable under the Illinois Statute of Frauds. For the aforementioned reasons, the motion to enforce settlement (D.E. 710) is respectfully denied.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: _3-16-06_____